SHARTSIS FRIESE LLP
MARY JO SHARTSIS (Bar #55194)
AMY L. HESPENHEIDE (Bar #200930)
One Maritime Plaza, 18th Floor
San Francisco, California  94111-3598
Telephone:  (415) 421-6500
Facsimile:  (415) 421-2922
Emails:   mjshartsis@sflaw.com
             ahespenheide@sflaw.com

Attorneys for Appellant
A. C. SPICER, TRUSTEE IN BANKRUPTCY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>GIUSEPPE ENZO CECCONI,<br><br>                              Debtor. | Case No. 5:07-cv-03636-JW<br><br>**APPELLANT'S BRIEF**<br><br>**The Honorable James Ware** |
| SARAH CECCONI,<br><br>                              Plaintiff,<br><br>        v.<br><br>GIUSEPPE ENZO CECCONI and A. C.<br>SPICER, TRUSTEE IN BANKRUPTCY,<br><br>                              Defendants. | |
| A.C. SPICER, TRUSTEE IN<br>BANKRUPTCY,<br><br>                              Appellant,<br>        v.<br><br>SARAH CECCONI,<br><br>                              Appellee. | |

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

1

**TABLE OF CONTENTS**

2

**Page**

3 INTRODUCTION ..................................................................................................1

4 STATEMENT OF APPELLATE JURISDICTION ............................................3

5 STATEMENT OF THE ISSUES PRESENTED AND STANDARD OF REVIEW .................3

6         A.    Issues Presented.........................................................................3

7         B.    Standard of Review ...................................................................4

8 STATEMENT OF THE CASE ...........................................................................4

9    I.     PROCEDURAL BACKGROUND.....................................................4

10    II.    FACTUAL BACKGROUND...............................................................5

11         A.    Historical Facts..........................................................................5

12         B.    Loans Mrs. Cecconi Made To Mr. Cecconi In 1981 And 1982 And The Royal Bank Loans To Enzo In 1988 And 1989 .................7

13

14         C.    Acquisition Of The Pebble Beach Townhouse And The Pebble Beach Property As Community Property .........................9

15         D.    Development Of The Pebble Beach Property.........................10

16         E.    Financing Of The Development Of The Property...................12

17         F.    The Cecconis Signed Mortgages As The "Owners In Fee" of the Property.................................................................14

18

19         G.    Advice Received By Sarah From Her Attorney In 1993 Regarding Enzo's Community Property Interest .....................14

20         H.    Conveyance Of Sarah Cecconi's Interest In The Pebble Beach Property To Her Living Trust In 1994.......................15

21

22         I.    Formation Of The Cecconi Residential Trust To Hold The Pebble Beach Property As Community Property .................16

23         J.    Third Party Witnesses Called by Mrs. Cecconi .....................17

24         K.    Testimony Concerning Sarah Cecconi's Alteration Of Documents, Document Review and Document Production...................18

25

26             1.    Testimony of Sarah Cecconi and Ms. Korb .................18

27             2.    Testimony of Sarah's Trial Attorney Elaine Seid........20

28

Sᴀᴀʀᴛsɪs  Fʀɪᴇsᴇ, ʟʟᴘ
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

**TABLE OF CONTENTS**
(continued)

Page

III.    THE BANKRUPTCY COURT'S MEMORANDUM DECISION AFTER TRIAL ..............................................................................................20

ARGUMENT...............................................................................................................21

I.    THE BANKRUPTCY COURT'S CONCLUSION THAT SARAH ESTABLISHED A RESULTING TRUST BY CLEAR AND CONVINCING EVIDENCE IS CLEARLY ERRONEOUS..............................22

    A.    Presumptions and Burden of Proof ........................................................22

    B.    The Bankruptcy Court's Conclusion That The California Gift Presumption Does Not Apply In This Case Is Erroneous As A Matter Of Law ....................................................................................23

    C.    There Was No Evidence That Sarah Intended In 1985 When Title Was Taken As Community Property That Enzo Would Not Have A Beneficial Interest.................................................................................25

        1.    The Bankruptcy Court's Findings As To The Source Of Payment.........................................................................................25

        2.    The Bankruptcy Court's Findings As To Sarah's Intent..............26

    D.    Sarah's Stated Purpose For Taking Title As Community Property Is Inconsistent With Separate Property Ownership .................................28

    E.    The California Resulting Trust Cases Do Not Support A Resulting Trust On The Facts Of This Case........................................................30

    F.    The Evidence Unequivocally Established That Sarah Cecconi Had Actual Knowledge Of The Actions Taken On Her Behalf, And She Approved And Ratified Those Actions ...................................................33

    G.    Sarah's Lack of Understanding Or Knowledge Of The Legal Effect Of Her Actions or Actions Taken On Her Behalf Does Not Insulate Her From the Consequences Of Those Actions......................................33

II.    THE CECCONIS EXECUTION OF THE CECCONI RESIDENTIAL TRUST AND CONVEYANCE OF THE PROPERTY TO THE RESIDENTIAL TRUST TERMINATED ANY PRE-EXISTING RESULTING TRUST ..........................................................................................34

    A.    The Residential Trust Is An Express Trust And Extinguished Any Resulting Trust In The Same Property ...................................................34

    B.    The Transfer Of The Pebble Beach Property To The Residential Trust At The Direction Of Sarah Cecconi Extinguished Any Pre-Existing Resulting Trust..................................................................36

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3    III.    SARAH'S CONVEYANCE OF HER COMMUNITY PROPERTY
        INTEREST TO HER LIVING TRUST AND CREATION OF THE
4        RESIDENTIAL TRUST RATIFIED ENZO'S BENEFICIAL INTEREST
        OR TRANSMUTED THAT INTEREST TO COMMUNITY PROPERTY........37

5
        A.    The Transfer Of Sarah's Interest In The Property To Her Living
6            Trust Ratified Its Community Property Character ....................37

7        B.    The Residential Trust Agreement Ratified Enzo Cecconi's
            Community Property Interest....................................38
8
        C.    If The Pebble Beach Property Was Separate Property, It Was
9            Transmuted To Community Property At Sarah's Direction....................39

10    IV.    MRS. CECCONI'S PURCHASE MONEY WAS REIMBURSED BY A
        JOINT OBLIGATION LOAN SECURED BY COMMUNITY
11        PROPERTY, THEREBY EXTINGUISHING ANY RESULTING TRUST.......42

12    V.    THE BANKRUPTCY COURT'S DECISION DENYING
        TERMINATING AND ADVERSE INFERENCE SANCTIONS IS
13        BASED ON ERRONEOUS FINDINGS OF FACT AND CONCLUSIONS
        OF LAW.................................................43
14
        A.    The Bankruptcy Court's Decision Not To Award Trustee
15            Terminating Sanctions Or Adverse Inference Sanctions Was Based
            On Clearly Erroneous Factual Findings ..................................43
16
            1.    It is undisputed that Sarah Cecconi failed to search for
17                responsive documents and deliberately produced only
                documents helpful to her own case..............................43
18
            2.    Sarah Cecconi irrevocably obliterated important information
19                from original documents by deliberately applying liquid
                white-out....................................................47
20
        B.    Terminating Or Adverse Inference Sanctions Were Supported By
21            The Facts And Applicable Law, And The Bankruptcy Court's
            Contrary Findings And Conclusions Are Clearly Erroneous Or An
22            Abuse of Discretion ................................................48

23    CONCLUSION..................................................................50

24

25

26

27

28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Altramano v. Swan,*
    20 Cal. 2d 622 (1942).................................................................................22, 23, 25

*Anheuser-Busch, Inc. v. Natural Beverage Distributors,*
    69 F.3d 337 (9th Cir. 1995).................................................................................49

*Bayles v. Baxter,*
    22 Cal. 575 (1863).................................................................................34

*Bissell v. King,*
    91 Cal. App. 420 (1928).................................................................................33

*Butler v. Butler,*
    188 Cal. App. 2d 228 (1961).................................................................................39

*Byrnie v. Town of Cromwell Bd. of Educ.,*
    243 F.3d 93 (2nd Cir. 2001).................................................................................48

*Caldwell v. Unified Capital Corp. (In re Rainbow Magazine),*
    77 F.3d 278 (9th Cir. 1996).................................................................................48

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991).................................................................................48

*Combs v. Rockwell Int'l Corp.,*
    927 F.2d 486 (9th Cir. 1991).................................................................................48

*Cooter & Gell v. Hartmarx Corp.,*
    496 U.S. 384 (1990).................................................................................4

*Copp v. Paxton,*
    45 Cal. App. 4th 829 (1996).................................................................................22

*Easley v. Cromartie,*
    532 U.S. 234 (2001).................................................................................4

*Estate of Bibb,*
    87 Cal. App. 4th 461 (2001).................................................................................41

*Finalco, Inc. v. Roosevelt (In re Roosevelt),*
    87 F.3d 311 (9th Cir. 1996).................................................................................32

*G. R. Holcomb Estate Co. v. Burke,*
    4 Cal. 2d 289 (1935).................................................................................22

*Gerdlund v. Electronic Dispensers International,*
    190 Cal. App. 3d 263 (1987).................................................................................36

*Glover v. BIC Corp.,*

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

APPELLANT'S OPENING BRIEF

1

**TABLE OF AUTHORITIES**
**(continued)**

2

Page(s)

3      6 F.3d 1318 (9th Cir. 1993) ..................................................................................49

4    *Gomez v. Cecena,*
        15 Cal. 2d 363 (1940)..............................................................................22, 23, 25
5
      *Gudelj v. Gudelj,*
6        41 Cal. 2d 202 (1953)...................................................................................passim

7    *Hayman v. Commissioner of Internal Revenue,*
        992 F.2d 1256 (2d Cir. 1993) ...........................................................................38
8
      *Hutchinson Co. v. Gould,*
9        180 Cal. 356 (1919).............................................................................................33

10   *In re Angelia P.,*
        28 Cal. 3d 908 (1981)..........................................................................................22
11
      *In re Estate of MacDonald,*
12       51 Cal. 3d 262 (1990).............................................................................39, 40, 41

13   *In re Foam Systems Company v. Simon,*
        92 B.R. 406 (1988)................................................................................................5
14
      *In re Freitas,*
15       16 F. Supp. 557 (S.D. Cal 1936)........................................................................25

16   *In re Lawson,*
        122 F.3d 1237 (9th Cir. 1997) .............................................................................4
17
      *In re Lopez,*
18       192 B.R. 539 (9th Cir. BAP 1996).......................................................................4

19   *In re Marriage of Barneson,*
        69 Cal. App. 4th 583 (1999)........................................................................41, 42
20
      *In re Pena,*
21       155 F.3d 1108 (9th Cir. 1998) .............................................................................4

22   *In re Rifino,*
        245 F.3d 1083 (9th Cir. 2001) .............................................................................4
23
      *Inamed Corp. v. Medmarc Cas. Ins. Co.,*
24       258 F. Supp. 2d 1117 (C.D. Cal. 2002)..............................................................22

25   *Jones v. Kelley,*
        121 Cal. App. 2d 130 (1953) ......................................................................30, 31
26
      *Keene v. Keene,*
27       57 Cal. 2d 657 (1962)..........................................................................................22

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3   *Kern County Water Agency v. Belridge Water Storage District,*
4     18 Cal. App. 4th 77 (1993) .................................................................................36

    *Kimmell v. Skelly,*
5     130 Cal. 555 (1900) ..........................................................................................38

6   *Knego v. Grover,*
      208 Cal. App. 2d 134 (1962) .............................................................................25
7

    *Latman v. Burdett,*
8     366 F.3d 774 (9th Cir. 2004), amended by 2004 U.S. App. LEXIS 11231 ..............4

9   *Lloyds Bank California v. Wells Fargo Bank,*
      187 Cal. App. 3d 1038 (1986) .......................................................................5, 23
10

    *Lowenthal v. Kunz,*
11     104 Cal. App. 2d 181 (1951) .............................................................................37

12   *Marani v. Jackson,*
       183 Cal. App. 3d 695 (1986) .............................................................................36
13

     *Marriage of Starkman,*
14     129 Cal. App. 4th 659 (2005) ...........................................................................41

15   *McKinnon v. McKinnon,*
       181 Cal. App. 2d 97 (1960) ..............................................................................24
16

     *National Hockey League v. Metropolitan Hockey Club,*
17     427 U.S. 639 (1976) .........................................................................................48

18   *Navrides v. Zurich Insurance Co.,*
       5 Cal. 3d 698 (1971) ........................................................................................33
19

     *Neverkovec v. Fredericks,*
20     74 Cal. App. 4th 337 (1999) .............................................................................36

21   *Owings v. Laugharn,*
       53 Cal. App. 2d 789 (1942) ..................................................................24, 30, 31
22

     *Oyama v. California,*
23     332 U.S. 633 (1948) .........................................................................................23

24   *Rakestraw v. Rodrigues,*
       8 Cal. 3d 67 (1972) ..........................................................................................33
25

     *Rench v. McMullen,*
26     82 Cal. App. 2d 872 (1947) ..............................................................................22

27   *Reusche v. California Pacific Title Insurance Co.,*
       231 Cal. App. 2d 731 (1965) .............................................................................33
28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1

## TABLE OF AUTHORITIES
### (continued)

2

Page(s)

3    *Roberts v. Ford Aerospace & Comm. Corp.*,
          224 Cal. App. 3d 793 (1990) ........................................................................22

4

      *Rossiter v. Schultz*,
5          43 Cal. App. 716 (1919) ..............................................................................23

6    *Seabury v. Costello*,
          209 Cal. App. 2d 640 (1962) ....................................................................30, 31

7

      *Shaw v. Bernal*,
8          163 Cal. 262 (1912)......................................................................................24

9    *Socol v. King*,
          36 Cal. 2d 342 (1950)..............................................................................24, 25

10

      *Trimble v. Coffman*,
11         114 Cal. App. 2d 618 (1952) ........................................................................25

12   *United States v. U.S. Gypsum Co.*,
          333 U.S. 364 (1948)........................................................................................4

13

      *Wilson v. Coffey*,
14         92 Cal. App. 343 (1928) ................................................................................38

15   *Wyle v. R. J. Reynolds*,
          709 F.2d 585 (9th Cir. 1983) ....................................................................48, 49

16

      *Zakaessian v. Zakaessian*,
17         70 Cal. App. 2d 721 (1945) ..........................................................................37

18

### Statutes

19   28 United States Code
          § 158(a)(1) ......................................................................................................3

20

      California Civil Code
21         § 19...............................................................................................................38
          § 51 (Unruh Civil Rights Act) .......................................................................24

22         § 853.............................................................................................................24
          § 2307...........................................................................................................33

23         § 2310...........................................................................................................33
          § 2311...........................................................................................................33

24

      California Evidence Code
25         § 662 ................................................................................................22, 25, 35
          § 662(a)..........................................................................................................35

26

27

28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

1

**TABLE OF AUTHORITIES**
**(continued)**

2

Page(s)

3    California Family Code ..................................................................................37
        § 852 .............................................................................................39
4        § 852(a) ...........................................................................3, 36, 39, 40
        § 1102 ............................................................................................32
5        § 761(a) ..........................................................................................29

6    California Government Code
        §§ 12900 *et seq.* (California Fair Employment and Housing Act) ............24
7

**Rules**

8
    Federal Rules of Evidence
9        § 302 ..............................................................................................22

10

**Constitutional Provisions**

11    California Constitution
        Article 1, § 7 ..................................................................................23
12
13    United States Constitution
        Fourteenth Amendment ...................................................................23

14

**Other Authorities**

15    Black's Law Dictionary (8th Ed. 2004) ..........................................................48

16    California Wills & Trusts
        1-3 § 3.04 ......................................................................................29
17        2-81 § 81.04 ...................................................................................28
        2-111 § 111.05 ...........................................................................28, 29
18
    G. T. Bogert, *The Law of Trusts and Trustees* (2d ed. 1991)
19        Resulting Trusts, § 464 ....................................................................22

20    Restatement of Trusts (Second)
        § 410(b) ..........................................................................................36
21        § 442, comment *a* ..........................................................................24

22    Restatement of Trusts (Third) ......................................................................24
        § 9 (2003) .......................................................................................24
23        § 9(2) (2003) ...................................................................................23
        Reporter's Notes § 9, comments *b* and *c* ........................................24
24
25    W. Fratcher, *Scott on Trusts*
        § 410 (4th ed. 1989) ........................................................................37

26    Witkin, *California Evidence*
        Documentary Evidence § 111 (2000) ................................................36

27

28

Shartsis Friese LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

**INTRODUCTION**

Adversary defendant A. C. Spicer is the Trustee ("Trustee") in the involuntary bankruptcy proceedings of Giuseppe Enzo Cecconi ("Enzo" or "Mr. Cecconi") pending in the High Court of Justice in Bankruptcy in England. The issue presented in the U.S. Bankruptcy Court and in this Court on appeal is whether the 4.52-acre parcel of improved real property in Pebble Beach, California (the "Pebble Beach Property" or "Property"), for which record title has been held by debtor Enzo Cecconi and his wife Sarah Cecconi ("Sarah" or "Mrs. Cecconi") as community property since 1985, is community property or whether Enzo's community property interest is held in a resulting trust for Sarah's benefit under California law.

In 1985 Sarah, a resident of Italy, acquired the unimproved land comprising the Pebble Beach Property with the intent of building a residence there. The land was selected and purchased without Enzo's involvement and was paid for by Sarah with a bank loan arranged by her father and secured by her separate property securities, which she inherited in 1979. Sarah took title in her and Enzo's names as "husband and wife, as Community Property." In 1990, her costs of the acquisition and development of the Property were reimbursed by a bank loan secured by a mortgage on the Property for which Sarah and Enzo were jointly liable. In 1994 Sarah transferred, with Enzo's written consent, her community property interest to a living trust she created in 1984 as part of her estate plan. In 1998, in furtherance of Sarah's estate plan, Sarah and Enzo created an express trust, the Cecconi Residential Trust (the "Residential Trust") and conveyed the Property to the Trust as community property for tax purposes on the advice of an estate planning specialist.

All of Sarah's property, except the Pebble Beach Property and a townhouse she acquired in 1984 in Pebble Beach, was held as her sole and separate property. The Property and the townhouse were held by Sarah and Enzo as community property. Sarah testified at trial that she did not recall why she took title to the Property jointly with Enzo as community property in 1985 and suggested that someone else directed that title be taken jointly, probably her father or her other advisors. Prior to trial she and Enzo both signed declarations stating that title was taken as community property as part of Sarah's estate plan. Sarah could not give any reason for taking

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9 4 11

title as community property if she did not intend Enzo to have a beneficial interest.

While Sarah knew that title was held jointly as community property at all times during the sixteen-year period prior to the commencement of this proceeding, she never told anyone—her father, her mother, her attorneys, her bankers or her many other professional advisers—that the Property was her sole and separate property. The application for a permit to develop the Property and numerous other documents she and Enzo signed in connection with the development throughout the 1980's and 1990's were in Enzo's name or in their joint names. Moreover, Sarah expressly declared the Property to be community property in 1998 when she and Enzo created the Residential Trust and conveyed their community property interests to that Trust.

In discovery, Sarah whited out Enzo's name on documents identifying him as a homeowner of the Pebble Beach Property before producing them to the Trustee. She altered other evidence as well, some of which could not be retrieved. Sarah's attorney testified at trial and could not represent that no other documents had been altered or that all responsive documents had been produced. Many documents admitted over Trustee's objections were not produced prior to trial even though they were responsive to Trustee's document requests. The evidence was undisputed that neither Sarah nor her attorneys ever reviewed all of the documents in her possession to identify responsive documents. Trustee moved for sanctions including, in the alternative, that judgment be entered in his favor, that adverse inferences be drawn against Sarah or that monetary sanctions for his attorney's fees and costs of the trial be awarded based on these discovery abuses. The Bankruptcy Court denied Trustee's motion, with the exception of monetary sanctions limited to any "additional fees" incurred solely as a result of the white-outs. No monetary award has yet been made.

Trustee appeals the judgment entered by the Bankruptcy Court that the Property—which had been treated as community property for over twenty years—is Sarah Cecconi's sole and separate property as contrary to California law and clearly erroneous based on the evidence, applicable law and Sarah's admitted discovery abuses.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

1

2

3

4

5

6

7

8

9

10

11

Shartsis  Friese  llp
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### STATEMENT OF APPELLATE JURISDICTION

This Court has appellate jurisdiction pursuant to 28 U.S.C. section 158(a)(1).

### STATEMENT OF THE ISSUES PRESENTED AND STANDARD OF REVIEW

**A.    Issues Presented.**

1.    Whether the Bankruptcy Court's findings and conclusions that Sarah Cecconi established the existence of a resulting trust and that the California gift presumption does not apply in this case are clearly erroneous.

2.    Whether the purchase money resulting trust claimed by Sarah was terminated or extinguished as a matter of law by the conveyance of the Property to an express trust (the Residential Trust) in 1998, or by her direction that the Property be conveyed to the trustees of the Residential Trust.

3.    Whether the conveyance by Sarah of her community property interest to her Living Trust in 1994 with Enzo's written consent and the written agreement between Sarah and Enzo in the Residential Trust that the Property "is community property" ratified the Property as community property or were sufficient to transmute (*i.e.*, change) to community property any separate property interest of Sarah held in trust by Enzo under Family Code section 852(a).[1]

4.    Whether the refinancing of the Property to reimburse Sarah for her acquisition costs by a note and mortgage executed in 1990 and refinanced in 1993 for which both Sarah and Enzo were jointly liable extinguished any resulting trust.

5.    Whether the Bankruptcy Court's findings and conclusions that terminating or adverse inference sanctions are not supported by the facts or law are clearly erroneous.

---

[1]    Trustee also appeals the Bankruptcy Court's denial of Trustee's motion to clarify an order entered by the Bankruptcy Court on Trustee's motion for summary judgment but only if Sarah contends that the summary judgment order precludes Trustee from raising the issue of transmutation or any other issue relating to the effect of the Residential Trust.  Transmutation was not raised or decided by the summary judgment motion, and Sarah stipulated to the modification requested by Trustee.  The Bankruptcy Court's denial of the motion to clarify is inexplicable in light of the stipulation and proposed order submitted to the Court on July 5, 2006.

**B.    Standard of Review.**

Questions of law are reviewed *de novo* and findings of fact for clear error. *In re Lawson*, 122 F.3d 1237, 1240 (9th Cir. 1997); *In re Rifino*, 245 F.3d 1083, 1087 (9th Cir. 2001); *In re Pena*, 155 F.3d 1108, 1110 (9th Cir. 1998); *Easley v. Cromartie*, 532 U.S. 234, 242 (2001).   A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Issues 1 and 5 are reviewed for clear error as to factual findings and *de novo* as to conclusions of law.   Issues 2 through 4 present questions of law and are reviewed *de novo*. Evidentiary rulings of the bankruptcy court are reviewed for abuse of discretion.  *Latman v. Burdett*, 366 F.3d 774, 786 (9th Cir. 2004), amended by 2004 U.S. App. LEXIS 11231.   A bankruptcy court abuses its discretion if its decision is based on an erroneous view of the law or on clearly erroneous factual findings.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *In re Lopez*, 192 B.R. 539, 543 (9th Cir. BAP 1996) ("A bankruptcy court would necessarily abuse its discretion if it bases its ruling upon an erroneous view of the law or a clearly erroneous assessment of the evidence.").

### STATEMENT OF THE CASE

**I.    PROCEDURAL BACKGROUND.**

In May 2001 an action was filed in Monterey County Superior Court (the "Monterey Action") by The Royal Bank of Scotland (the "Royal Bank"), one of Enzo's creditors, seeking a prejudgment attachment of the Property.  Sarah and Enzo each submitted a declaration opposing the attachment.  Sarah's declaration stated:  "I placed my husband, Giuseppe Enzo Cecconi's name on title to the Property as part of my estate plan."  Exh. BK ¶ 6.  Enzo's declaration stated: "My name was put on this property for estate planning purposes."  Exh. BL ¶ 9.

After the attachment order issued, the Royal Bank learned that Enzo had been declared bankrupt by order of the English High Court of Bankruptcy on January 8, 2001.  Trustee was appointed as trustee of Giuseppe Enzo Cecconi's bankruptcy estate in October 2001 and commenced this ancillary bankruptcy proceeding in January 2002.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1    Sarah Cecconi commenced an adversary proceeding in January 2003, claiming that the

2    Property was held by Enzo in a purchase money resulting trust[2] for her benefit and was not

3    subject to Enzo's creditors claims.  Clerk's Record ("CR") 1.  Trustee filed a counterclaim and

4    cross-claim against Sarah and Enzo, respectively, for a declaration that the transfer of the

5    Property to the Residential Trust did not shelter Enzo's community property interest from the

6    claims of creditors or, alternatively, was a fraudulent conveyance.  CR 6.  Trustee moved for

7    summary judgment.  CR 77.  The Bankruptcy Court denied Trustee's motion as to Sarah's claim

8    for a resulting trust and granted the motion as to Trustee's counterclaim and cross-claim, holding

9    that the transfer to the Residential Trust did not shelter the Property from the claims of Enzo's

10   creditors, thus resolving Trustee's need to pursue the fraudulent conveyance claim.[3]  CR 92.

11   Trial in the Bankruptcy Court commenced March 21, 2005 and concluded May 31, 2005.

12   Post-trial briefs and reply briefs were submitted on October 28, 2005 (CR 175 and 178).  Oral

13   argument was not scheduled until September 22, 2006, and the Court then requested further post-

14   trial briefing (CR 197), which was submitted on November 22, 2006.  CR 198 and 200.  Finally,

15   on April 17, 2007, the Court issued its Memorandum Decision After Trial (CR 202 and hereafter

16   "Decision" or "MD") concluding that Enzo held his community property interest in the Property

17   in a resulting trust for the benefit of Sarah.  Judgment was entered on July 2, 2007.  CR 210.

18   Notice of appeal was filed by Trustee on July 12, 2007.  CR 212.

19   **II.    FACTUAL BACKGROUND.**

20       **A.    Historical Facts.**

21   Sarah Coleman and Enzo Cecconi were married in 1974 in Venice, Italy, where Enzo

Shartsis  Friese  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

---

22

23   [2]    A resulting trust is an implied trust that arises by operation of law when one person pays for property but title is taken in the name of another "under circumstances showing that the

24   transferee was not intended to take the beneficial interest."  *Lloyds Bank California v. Wells Fargo Bank*, 187 Cal. App. 3d 1038, 1042 (1986); *In re Foam Systems Company v. Simon*, 92 B.R. 406, 409 (1988).

25   [3]    After the Court's order (CR 92) was entered and just before trial, Sarah argued that the

26   summary judgment order was broad enough to dispose of issues in her favor and against Trustee that had not been raised by the motion.  Trustee moved for clarification of the order.  CR 141.

27   Even though the parties subsequently stipulated to the clarification (CR 194), the Bankruptcy Court nonetheless denied Trustee's motion to clarify the order.  CR 202 at 35.  Trustee appeals

28   the denial of the motion to clarify to the extent Sarah contends it bars raising any issue on appeal.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1    managed the Cipriani Hotel.  Italy has been Sarah's primary residence ever since.  In 1978,

2    Mr. Cecconi left the Cipriani to open a restaurant in London with funds borrowed from Sarah's

3    mother, Elizabeth Montagu ("Mrs. Montagu"), the Dowager Duchess of Manchester.

4    Mrs. Montagu maintained a residence in London where Sarah frequently stayed after Enzo

5    opened his London restaurant.  Sarah did not work and spent most of her time traveling overseas.

6    MD at 3.  Enzo's restaurant was very successful, and he acquired and renovated a residence in

7    London near Sarah's mother's residence where Sarah and Enzo resided when they were in

8    London.  Enzo's personal London residence was owned by Enzo business, Cecconi Restaurateurs,

9    Ltd. ("CRL").  CRL directly paid for the London residence, property, its renovation, and Enzo's

10   other personal living expenses.  In the early 1990's, the restaurant began to experience serious

11   financial problems and went into liquidation in the late 1990's.  MD at 28-29.

12       Neither Enzo nor Sarah is domiciled in California, and both limit their stays in California

13   to avoid tax liability as residents.  Trial Transcript ("TT") 1737:8-1738:6; Exh. BL ¶¶ 1-5.  Sarah

14   files tax returns in the United States on the income she earns from her securities.  Enzo has never

15   filed a tax return in the United States.  Sarah's mother maintains a residence in Venice, Italy, and

16   Mr. and Mrs. Cecconi consider her home in Venice to be their principal place of residence.

17   TT 118:23-119:2; 119:24-120:12.  Mrs. Cecconi's mother also maintains a residence in Pebble

18   Beach.  TT 2029:4-16.

19       Sarah grew up in a very wealthy family and spent part of her childhood in Pebble Beach.

20   After her parents divorced, she lived primarily with her mother in Pebble Beach, England or Italy,

21   while Sarah's father, George Coleman ("Mr. Coleman"), resided in Palm Beach, Florida.  In

22   1979, Sarah inherited a substantial fortune upon the death of her paternal grandmother.  Sarah's

23   father managed all of Sarah's financial affairs and property from his office in Palm Beach from

24   the time she received her inheritance until his death in 1997.  TT 861:2-21; 863:10-24; 1833:7-

25   1834:9 (referring to Exh. BX).  With Sarah's knowledge and authority, Mr. Coleman retained

26   lawyers, accountants, financial planners and investment advisers on her behalf.  TT 863:10-24.

27       Sarah's inheritance consisted of a substantial stock portfolio and other miscellaneous

28   property, all of which were held as her sole and separate property.  The stocks had a very low cost

basis and a high market value, making them difficult to sell without significant taxes. With Sarah's knowledge and consent, Mr. Coleman managed Sarah's affairs to minimize taxes. From 1979, he had authority to act on Sarah's behalf and had a general power of attorney over her property and her bank account, which was maintained at the First Union National Bank in Palm Beach ("Florida Bank"). Exhs. 45 and 46; Exh. BX ¶ 5, TT 1591:14-1592:23.

Sarah lived primarily on dividends earned on her stocks. Mr. Coleman, with the assistance of his secretary Carla Korb ("Ms. Korb"), arranged loans by the Florida Bank when necessary to meet Sarah's living or other expenses and avoided selling her stocks because of the significant capital gains taxes that would be incurred. TT 413:17-415:9. Sarah deducted the interest paid for these loans from her U.S. income taxes. TT 1853:4-12.

Ms. Korb acted as Sarah's secretary until February 1998. TT 415:10-13. Following Mr. Coleman's death, Ms. Korb sent to Sarah in Pebble Beach all of the files and financial records she had maintained for Sarah in Florida. TT 865:12-22. In 2002, Sarah hired Ms. Korb to assist her in connection with her claim in this adversary proceeding, and Ms. Korb moved to California and commenced reviewing the documents she had sent to Sarah in 1998 to support Sarah's claim that she paid for the Property and all improvements with her separate property funds. Ms. Korb reviewed the boxes she had sent in 1998 for that purpose and did not testify that any of the boxes she had previously sent to Sarah were missing. TT 416:18-418:1.

## B.    Loans Mrs. Cecconi Made To Mr. Cecconi In 1981 And 1982 And The Royal Bank Loans To Enzo In 1988 And 1989.

Trustee presented evidence at trial that Enzo contributed $300,000 or more to improving the Property, which Enzo borrowed from the Royal Bank for that purpose. Sarah's financial records showed that Enzo had deposited approximately $582,000 in Sarah's Florida Bank account from 1982 to 1991. *See* CR 220 and 221, Appendix I; Exhs. 57-65. Sarah testified at her deposition that she made undocumented loans to Enzo in the early 1980's. Exh. BP and TT 137:2-138:11; 142:22-24. However, at trial Sarah offered in evidence two promissory notes, one dated 1981 for $200,000 and the other dated 1982 for $100,000 (the "Notes"), both payable to the Florida Bank by Sarah and Enzo as "co-borrowers." Neither of the Notes had previously

Shartsis Friese LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

been produced.  Exhs. 163, 165; TT 424:23-425:7; 439:13-21.  At trial, Sarah testified that these Notes reflected the loans to Enzo for his restaurant business referenced in her deposition testimony.  TT 1601:25-1603:9.  Sarah claimed she did not appreciate the relevance of these Notes until Trustee's Trial Brief argued that Enzo had deposited $300,000 in her Florida Bank account to assist with Property improvements.  CR 136; CR 230.  The loan documents were signed by both Sarah and Enzo as co-borrowers, but Sarah and Enzo testified that they were Enzo's sole financial responsibility.  Both loans were arranged by Mr. Coleman.  TT 426:4-19; 443:8-19.

To explain the $300,000 and other deposits to Sarah's bank account, Enzo testified that in 1978 Sarah's mother, Mrs. Montagu, made him an undocumented, open-ended loan of $200,000 for his restaurant.  TT 328:5-7.  After Sarah received her inheritance, Mrs. Montagu asked Sarah to repay her loan to Enzo, and Sarah did so.  TT 1832:16-1833:5.  Sarah's father obtained a loan from her Florida Bank in 1981 for this purpose to avoid Sarah selling any of her stocks.  TT 1905:15-25.  In 1982, Sarah volunteered to give Enzo the money to buy out a partner in his Paris restaurant, and Mr. Coleman arranged a $100,000 Florida Bank loan for that purpose.  TT 235:16-236:4.  Sarah and Enzo both jointly signed the two Florida Bank Notes.  Although Enzo's restaurant was doing very well in the early and mid-1980's, Enzo felt no need to repay these Notes.  TT 328:19-329:20.  Sarah paid the interest on the loans and deducted the payments from her income.  TT 1906:20-1907:1.  Sarah and Enzo testified that the $300,000 wired to her account in 1988 and 1989 was to pay off these Notes.

In the early 1980's, Enzo approached the Royal Bank for a line of credit for CRL.  He also opened a bank account in his and Sarah's names and obtained a personal line of credit.  Enzo testified that he never disclosed to the Royal Bank that he owed $300,000 to his wife or Mrs. Montagu in connection with these requests for credit.  TT 321:1-15; 324:18-325:8; and 339:16-20.  Sarah never asked Enzo to repay the Notes, but believed her father probably asked him to repay them when she needed additional funds for the development of the Property in 1988 and 1989.  TT 1828:25-1829:23; TT 1827:5-8.  The Florida Bank Notes produced for the first time at trial were admitted in evidence, over Trustee's objections, to rebut Trustee's claim that

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    Enzo contributed at least $300,000 to the development of the Property.  TT 210:13-211:8.

2
3
      C.    **Acquisition Of The Pebble Beach Townhouse And The Pebble Beach Property As Community Property.**

4    Mr. Coleman, with Ms. Korb's assistance, made all financial and legal arrangements for

5    Sarah's purchase of real property in Pebble Beach in 1984 and 1985.  In September 1984, Sarah

6    purchased a townhouse in Pebble Beach (the "Townhouse") to use while looking for a lot to build

7    a new residence.  While she initially acquired the Townhouse, as "a married woman as her sole

8    and separate property" (Exh. G; TT 1728:11-19), Sarah immediately conveyed her interest in the

9    Townhouse by a grant deed to "Giuseppe E. Cecconi and Sarah Coleman Cecconi, Husband and

10   Wife as Community Property."  Exh. H; TT 1735:7-1736:1  TT 1610:20-23; 1745:6-1746:2.  At

11   trial, Sarah did not dispute that she conveyed the Townhouse to herself and her husband as

12   community property, but did not recall why she did it or who prepared the deed.  She believed it

13   probably was done at the direction of her father or by attorney Douglas Sanders ("Mr. Sanders")

14   or other advisers.  TT 1838:7-1839:17; 1841:16-20; Exh. BX ¶ 16.

15   In June 1985, Sarah purchased the Pebble Beach Property.  Exh. A; TT 1616:12-19.

16   Sarah alone signed the Real Estate Purchase Contract and Deposit Receipt but did not designate

17   herself as the owner of the Property.  Exh. 1; TT 1739:4-13.  Rather, in the space provided to

18   designate how "title [should] vest," the words, "Instructions to follow," were typed.  Exh. A.  At

19   trial, Sarah testified that she did not recall providing instructions concerning title, and could not

20   remember whether she had asked anyone else to provide instructions.  Exh. A; TT 1740:12-15.

21   However, Sarah confirmed at trial that an earlier declaration in which she stated that "I placed my

22   husband . . . on title as part of my estate plan" was truthful.  Exh. BK ¶ 6; TT 1808:1-10.

23   Sarah took title to the Property on October 4, 1985 in the names of "GIUSEPPE E.

24   CECCONI AND SARAH COLEMAN CECCONI, husband and wife as Community Property."

25   Exhs. 9 and 10 (reflecting the two parcels that made up the 4.52 acres purchased).  *Id.*  Ms. Korb

26   testified that both she and Mr. Coleman reviewed the deeds showing Sarah and Enzo's

27   community property ownership.   TT 896:16-898:25.   Neither Sarah, nor Mr. Coleman nor

28   Ms. Korb ever requested that the community property deeds be changed.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

1   Sarah testified that she and Enzo had no oral or written agreement or understanding

2   regarding their finances generally or the Property specifically and that they had never discussed

3   the subject.  TT 1596:10-1597:3, TT 1597:9-13.  She testified that she never advised any of the

4   people she dealt with concerning the Property that it was her sole and separate property

5   (TT 1901:21-1904:8; 1780:15-23), but she had an understanding with Enzo that "what was mine

6   was mine and what was his was his" (TT 1597:12-13) and did not consider Enzo a co-owner of

7   the Property even though documents she signed indicated he was a co-owner.   TT 1646:18-

8   1647:6.

9   Sarah testified on direct examination that she did not know how title to the Property was

10   held until the Monterey Action was served on her in May 2001, but then acknowledged in

11   response to her counsel's further questions that she had seen or signed numerous documents that

12   indicated her and her husband's co-ownership at various times over the years, but these

13   documents "didn't mean anything" to her.  TT 1634:21-1635:17.

14   With Sarah's authority, Mr. Coleman managed the purchase and development of the

15   Property.  He obtained the financing for both the acquisition and development from the Florida

16   Bank.   Exhs. 8 and 12; TT 1775:23-1776:8.   He assisted with development permits and

17   construction with a power of attorney from both Sarah and Enzo.  Exh. AE; TT 1766:18-1767:15.

18   **D.    Development Of The Pebble Beach Property.**

19   Sarah and Enzo testified that Sarah developed the Property without Enzo's involvement.

20   TT 191:11-192:7;  1638:17-1640:15.   However, Brian Finegan, the attorney who obtained

21   permission for the Cecconis to build on the Property, met with both Mr. and Mrs. Cecconi, and

22   his bills were addressed to Mr. and Mrs. Cecconi and show meetings and telephone calls with

23   Mr. and Mrs. Cecconi separately or together between 1987 and 1990.  Exh. 75 at 1, 5, 7, 10, 15

24   and 19.  Mr. Cecconi recalled attending at least one meeting with Mr. Finegan but denied active

25   involvement.    TT 627:17-22 and 634:23-635:10.    Neither Enzo nor Sarah ever advised

26   Mr. Finegan that Sarah Cecconi was the sole owner of the Property.  TT 650:1-21; 651:7-12;

27   1901:21-25.

28   Mr. Finegan submitted the application for the coastal development permit in Enzo's name.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

1    In 1988, Mr. Finegan wrote to the Monterey County Planning Department on behalf of both
2    Mr. and Mrs. Cecconi "to explain the Cecconi's [sic] purpose and objective in filing for this
3    Coastal Development Permit."  Exh. S.  He stated that "[w]hen Mr. and Mrs. Cecconi returned
4    from Europe and saw the revised plan, they were very unhappy with the modifications, and
5    notified the Coastal Commission that they were not willing to accept or build the modified plan."
6    *Id*.  *See also* Exh. T (letter from Mr. Finegan referencing the Cecconis' request for a maximum
7    coverage variance and referring to the "Cecconis," plural, several times).  Records of the
8    Monterey County Planning and Building Inspection Department ("Planning Department") also
9    name Giuseppe Cecconi as the owner of the Property and many name him as the "Applicant."
10   Exhs. U, V, W, X, Z, AA and AB.

11       The architect for the residence, Alan Turpen, submitted a Design Approval Request to the
12   Planning Department in February 1988 on behalf of both Mr. and Mrs. Giuseppe Cecconi as the
13   "Property Owner," and Enzo acknowledged at trial that he reviewed these plans.  Exh. R;
14   TT 636:13-14.  The blueprints submitted by Mr. Turpen to the Monterey County Planning
15   Department bear the title, "Residence for Mr. and Mrs. Cecconi."  Exh. CS.  Mrs. Cecconi did not
16   advise Mr. Turpen that she was the sole owner of the Pebble Beach Property.  TT 1902:1-3.

17       Hunt Construction was retained to build the residence and it retained other professionals
18   to provide reports required for a development permit who similarly acted for both Mr. and
19   Mrs. Cecconi as the joint owners.  The mandatory Forest Management Plan and the mandatory
20   Botanical Survey filed with the Planning Department similarly stated that Mr. and
21   Mrs. Giuseppe E. Cecconi were the owners of the Property.  Exhs. O and P.  The Cecconis'
22   neighbors also acknowledged the Cecconis' joint ownership of the Property in their letter
23   supporting the Cecconis' development permit, which Sarah Cecconi requested they provide.  The
24   letter identified the applicant as "Giuseppe Cecconi."  Exh. Y; TT 1757:18-1758:2.

25       In May 1990, Sarah signed and submitted an application for an alarm system to the
26   Monterey County Sheriff that expressly identified, in her handwriting, both her and Enzo as the
27   "Owner" of the Property.  Exh. AM; TT 1775:4-8 and 14-17.

28       Mr. and Mrs. Cecconi were required to grant a conservation and scenic easement on the

Property.  TT 1041:12-1042:4 and 1766:18-1767:7.  The deed identified Enzo and Sarah as the "Grantor," and states that "the said Grantor is the owner in fee of the real property hereinafter described. . . ."  Exh. AE.  Since both Sarah and Enzo were out of the country, they each authorized Mr. Coleman to execute the easement deed on their behalf.  TT 1038:18-20 and 1767:13-15.  They subsequently gave public notice that the Forest Management Plan and Botanical Survey had been filed by them as "owners in fee."  Exh. AG; TT 1769:17-1770:25.  In sum, Mr. and Mrs. Cecconi executed numerous documents, including permit applications, easement notices, mortgages and other agreements over the subsequent 16 years which show that Sarah and Enzo knew that they jointly owned the Property.  *See, e.g.*, Exhs. AE, AG, AM, AP, AQ, BA, BB, BC and BD.  The property tax statements and homeowners' insurance statements for the Property were also sent to them jointly and they never requested any change or correction.  Exhs. AU, BG, 88.

### E.    Financing Of The Development Of The Property.

Sarah's father arranged construction financing with the Florida Bank between 1988 and 1989 through a line of credit Sarah secured by her separate property stocks.  Sarah also used these funds to pay her living expenses.  *See* Exhs. 62A and 63A.  Sarah, Enzo and Ms. Korb testified that Enzo did not contribute any funds for the development of the Property.  TT 1630:21-1631:7.

The Royal Bank business records show that during the construction period on the Property in 1988 and 1989, Enzo sought substantial personal loans from the Royal Bank "to enable him to effect payments in respect of the new California property."  Exh. AD.  According to the contemporaneous Royal Bank business records, Enzo sought a personal loan in the amount of £250,000 in 1988.  The report submitted by the Royal Bank account manager in May 1988 seeking approval of the personal loan indicated that "Mr. Cecconi has already paid £100,000 towards the incidental costs [of the Pebble Beach Property] and now wishes to make a second and final payment of US $300,000 in this respect."  Exh. AC.  Various Royal Bank business records also note Mr. Cecconi's extensive withdrawals of money from the restaurant business as well as the increase in personal borrowings to "[a]ssist construction of a substantial family property in California" during the period 1988 to 1990.  Exhs. AC, AD and AH, AT.  Enzo wired $300,000

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

borrowed from the Royal Bank to Sarah's Florida bank account in 1988 and 1989 and deposited approximately $582,700 in her account during the period 1982 through 1991. Exhs. Q and AF. See Appendix I to Trustee's Post-Trial Reply Brief, CR 178.

Neither Sarah nor Enzo produced a highly relevant document, Exhibit DE, which sets out the terms of Enzo's borrowings from the Royal Bank to pay for improvements to the Property.[4] This document was provided by either Enzo or Sarah privately to their friend, Gary Vandeweghe, who assisted the Cecconis with this litigation by taking depositions in London of Trustee and a representative of the Royal Bank. Vandeweghe used Exhibit DE in his examination of a representative of the Royal Bank, which reflects the terms of the loan from the Royal Bank and Sarah's knowledge of it. Dated 8 June 1988, from H M Aitken, manager of the Royal Bank, West London Branch, the document shows a loan to benefit "G.E. and Mrs. S.C. Cecconi" and notes that it is "in respect of the California property." The documents states in pertinent part:

> G E and Mrs. S C Cecconi: Additional borrowing facility of £100,000 in respect of the California property resulting in a total requirement of £250,000. The loan will be repayable over 6 years by monthly installments of £3,500.
>
> Interest:            Base + 2 1/2% minimum 6 1/2% to be applied quarterly.
> Arrangement Fee:     £2,500.
> Security:            A Charge initially to be taken over the Enzo Holdings by Shares and thereafter a Legal Charge over the new London Property.

Exh. DE. At trial, Sarah acknowledged her handwritten notes on the document, which state in part: "They took £3,500 every month." *Id.* TT 1798:8-18.

Enzo testified at trial that he had met with the local Royal Bank branch manager during 1988 and 1989 and had informed the branch manager of the Property. TT 584:9-12; 585:2-8; and 586:1-6. At his deposition two years earlier, Enzo did not recall ever mentioning the Property to the branch manager. Exh. BQ at 56-57. While Enzo admitted that the Royal Bank records were substantially correct (TT 349:19-350:11; 1017:8-25), he denied he borrowed any funds for the Property. Instead, he testified that he told the Royal Bank that the borrowings were to repay loans

---

[4] This document was unquestionably improperly withheld from production because it states that the loan is for the "California property." Trustee was unaware of this document until shortly before trial.

from his wife to free up collateral given by her to the Florida Bank so she could obtain additional funding for improvements to the Pebble Beach Property.  TT 349:19-350:9.  This testimony contradicted Enzo's previous declaration in the Monterey Action that money he borrowed personally from the Royal Bank was used primarily "for living expenses," and that "all of that money was expended in England or Italy."  Exh. BL, ¶¶ 7, 10.  It also contradicted another declaration Enzo submitted in this case that the loans from Sarah had been repaid from "the revenue of my business" (Exh. BW ¶ 5) and Enzo's statement to Gary Vandeweghe that all of his borrowings from the Royal Bank were spent in England or Paris for his restaurants. TT 2002:14-23.  Enzo finally admitted at trial that the $300,000 at least indirectly assisted with the improvements.  TT 349:19-351:7.

### F.    The Cecconis Signed Mortgages As The "Owners In Fee" of the Property.

In 1990, following completion of construction, the Cecconis obtained permanent financing as co-borrowers and co-obligors.  The loan was secured by a mortgage on the Property. Exh. AQ. TT 1776:1-1777:2.  In the mortgage itself, the Cecconis represented to the bank that they together, as the "Borrower," were "lawfully seized of the estate hereby conveyed. . . ." Exh. AQ.  Sarah and Enzo each signed the mortgage (TT 1776:16-22) and it was recorded on September 25, 1990 (TT 1776:23-1777:2).  Sarah and Enzo each initialed multiple pages of the mortgage and related documents.  *See* Exh. AQ; TT 1777:22-1778:4; TT 1778:15-22; Exh. 28 and TT 1854:11-20; Exh. 29 at 2 and TT 996:6-19.

Sarah and Enzo modified and extended the 1990 mortgage on June 1, 1993.  Again, as co-borrowers, they represented to the Florida Bank that they were "the owner in fee simple" of the Property, and they were both obligated for the mortgage payments.  Exh. BB.  Sarah and Enzo each signed the mortgage extension, and Sarah never told anyone at the Florida Bank that Enzo was not an owner.  *Id*.; TT 1780:15-23.

### G.    Advice Received By Sarah From Her Attorney In 1993 Regarding Enzo's Community Property Interest.

Douglas Sanders ("Mr. Sanders") was a tax attorney and Certified Public Accountant consulted by Mr. Coleman on Sarah's behalf.  TT 863:10-24; 879:5-7.  Sarah paid Mr. Sanders

APPELLANT'S OPENING BRIEF

Shartsis  Friese  llp
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1    over $14,000 for his legal advice in 1993. Exh. 67A at 2 (#4577), 13 (#4815) and 21 (#4918).

2    Sarah testified that he also probably prepared the deed she signed conveying the Townhouse from

3    her separate property to community property in 1984. TT 1838:21-24.

4        In 1993, prior to refinancing the Property, Sarah met in person with her father and

5    Mr. Sanders to discuss her investment portfolio and Enzo's ownership interest in the Property.

6    TT 1643:23-1644:10. Mr. Sanders wrote a follow-up letter to Sarah dated June 2, 1993, with a

7    copy to her father, stating: "Now that the refinancing of Pebble Beach has been completed, I

8    wanted to follow up with you on the two other agenda items that we discussed during our meeting

9    with your father." Exh. AY at SC000457. Mr. Sanders wrote that one topic discussed during the

10   meeting was to have Enzo contribute one-half of the costs Sarah had advanced for the acquisition

11   and improvement of the Property. *Id.* at SCOOO458. Mr. Sanders calculated Enzo's share of the

12   costs advanced by Sarah and recommended that "Mr. Cecconi, ***as a co-owner of the property***,

13   should reimburse you for 50% ($317,509) of the expenditures paid for the Pebble Beach property.

14   In addition, Mr. Cecconi should reimburse you for one-half of the future payments for the

15   mortgage, real estate taxes and improvements on the property." *Id.* at SC000459 (emphasis

16   added). He suggested that Enzo could pay her "over a period of time and in amounts that would

17   not put any additional burden on Mr. Cecconi." *Id.* Sarah testified that she did not tell

18   Mr. Sanders or her father at the meeting that the Property was, or was intended be, her separate

19   property and did not respond to Mr. Sander's letter. TT 1903:22-24; 1645:24-1647:6.

20

21   **H.    Conveyance Of Sarah Cecconi's Interest In The Pebble Beach Property To Her Living Trust In 1994.**

22       Sarah was familiar with trusts because she had been a beneficiary of her grandmother's

23   trust, knew many people who had established trusts and had herself established the Sarah C.

24   Cecconi Living Trust in 1984 on the advice of her father and her attorneys to hold her separate

25   property assets. Exh. 120. Sarah transferred all of her separate property, including her stock

26   portfolio and bank accounts to her Living Trust. Exhs. 116 and 117.

27       In 1994, less than a year after discussing Enzo's ownership of the Property with

28   Mr. Sanders and her father, Sarah retained Thomas Hart Hawley ("Mr. Hawley"), an attorney in

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1    Carmel, California, to advise her on estate planning. Mr. Hawley represented Sarah and acted on

2    her directions. Mr. Hawley prepared the papers necessary to transfer Sarah's community property

3    interest in the Pebble Beach Property to the Sarah C. Cecconi Living Trust to maximize favorable

4    tax treatment on her death. Exhs. BA and BZ; TT 1785:1-19; 1787:11-17.

5        Sarah executed a deed granting her "community property interest" in the Property to Sarah

6    Cecconi as Trustee of the Sarah C. Cecconi Living Trust on May 4, 1994. Because Enzo was an

7    owner of the Property, his consent was required to transfer her community property interest under

8    Family Code section 1102(a). Enzo's written consent was given on January 5, 1995, and the

9    grant deed was recorded with the Monterey County Recorder on January 6, 1995. Exhs. BA, BX

10   and BZ. Sarah never advised Mr. Hawley that the Pebble Beach Property was her sole and

11   separate property. TT 1903:25-1904:8.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

## I.    Formation Of The Cecconi Residential Trust To Hold The Pebble Beach Property As Community Property.

14       In 1998, Sarah sought Mr. Hawley's advice again regarding her estate plan and

15   minimizing taxes. TT 1788:22-1790:16; 1685:17-1686:3. Sarah testified that in 1998 she was

16   concerned that if she died and Enzo had to sell the Property, capital gains taxes and California

17   and federal taxes generally would be "tremendous." TT 1790:8-16.

18       On Mr. Hawley's advice, Sarah and Enzo established the Cecconi Residential Trust. Each

19   signed the Residential Trust agreement as Settlors and Co-Trustees on April 13, 1998 (Exh. BD

20   at 15; TT 1056:21-1059:9 and 1793:4-11), expressly declaring that the Property "is the

21   community property of the parties." The Residential Trust provides:

> The trust estate will initially consist of the Settlors' principal residence located at 3190 Del Ciervo Road in Pebble Beach, California, together with any tangible personalty that is the Settlor's community property located therein. *The Settlors declare that* any property held by them as joint tenancy prior to its transfer into the trust is in fact community property and, furthermore, *that all property listed on Schedule A is the community property of the parties*.

26   Exh. BD at 1-2 (emphasis added). The Property is listed on Exhibit A to the Trust Agreement.

27   *Id.* at Exh. A; TT 1789:11-13. Sarah and Enzo also expressly provided that should the Trust

28   Agreement be revoked, the Property "shall *continue* to be [their] community property . . . and [ ]

1   shall be held and administered as community property." Exh. BD at 3 (emphasis added).

2       Sarah, as trustee of her Living Trust, and Enzo executed a grant deed conveying their

3   respective interests in the Property to "Giuseppe E. Cecconi and Sarah C. Cecconi, Co-Trustees

4   of the Cecconi Residential Trust." Exh. BC. TT 1059:12-1060:14 and 1793:15-20. The deed

5   was recorded on April 14, 1998. Exh. BC; TT 1059:12-17. Sarah testified that she and Enzo

6   signed the Residential Trust agreement and deed based on Mr. Hawley's advice, and in his

7   presence, and had no reason to believe it wasn't good advice. TT 1789:11-1791:24; TT 1057:14-

8   1058:22.

9       Since 1985, Sarah and Enzo have both been the record owners of the Property either

10  individually or as Trustees of the Cecconi Residential Trust. Property tax bills have always been

11  addressed to them jointly. *See, e.g.*, Exh. AU. During all of these years, Sarah never requested

12  any correction or change to the ownership records maintained by the Monterey County Tax

13  Collector or the Monterey County Recorder, TT 1784:21-25, and Enzo on at least one occasion

14  paid the property taxes from their joint bank account in Pebble Beach. Exh. DB. The Cecconis

15  have always been listed as joint homeowners on their homeowners' insurance policies, and

16  invoices have always been addressed to them jointly. Exh. 88; TT 1566:7-24. During discovery,

17  Mrs. Cecconi improperly whited out her husband's name on most of these homeowner's

18  insurance documents before those documents were produced.

19      After proceedings commenced against Enzo in the Monterey Action, Sarah had

20  Mr. Hawley prepare a grant deed conveying the Property to her as her sole and separate property.

21  Exh. CB; TT 1688:14-1689:1 When asked at trial, "Why did you do that?" she answered: "Well,

22  [T]he Royal Bank of Scotland had come after me, and so I asked Enzo to do a grant deed." *Id.*

23  But this deed has never been recorded, and title to the Property remains in Enzo and Sarah's joint

24  names as Trustees of the Cecconi Residential Trust. TT 2316:7-23 and 2319:21-25.

25      **J.    Third Party Witnesses Called by Mrs. Cecconi.**

26      Mrs. Cecconi called three third-party witnesses—her mother, Jane Steel and Gary

27  Vandeweghe. Mr. Vandeweghe had also provided legal advice and assisted her by taking

28  depositions in London. Mrs. Cecconi also called her trial attorney, Elaine Seid, whose testimony

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1   is discussed in Section L below.  Mrs. Cecconi did not call any of the attorneys, contractors or

2   other agents who were involved in the purchase, the permit process, the design and construction

3   of the Property residence or the lawyers who gave her estate planning advice.

4          Mrs. Montagu and Ms. Steel each testified that they thought the Property was Sarah's

5   because they assumed or knew that she paid for it.  TT 2032:13-15 (Montagu); and 2062:17-19

6   (Steel).  Mr. Vandeweghe testified that Sarah told him she bought the Property and that it was

7   hers, that "[e]verything in the U.S. was Sarah's and anything in Europe was Enzo's."  TT 1984:

8   13-14; TT 1978:18-1979:18.  All three witnesses testified that prior to this lawsuit they had no

9   knowledge of how title to the Property was held or of the existence of the Residential Trust.

10  TT 2041:18-2043:13 and 2044:22-2045:13 (Montagu); TT 2065:12-2066:10 (Steel); TT 1988:12-

11  1991:4 (Vandeweghe).    Mrs. Montagu (TT 2034:21-24) and Jane Steel (2065:12-19) both

12  testified that Sarah did not discuss ownership of the Property or her estate planning with them.

13  Mrs. Cecconi testified several times that she does not disclose such information to anyone

14  because she doesn't like anyone knowing about her personal affairs.    TT 1901:21-1904:8;

15  1780:15-23.

16

17         **K.      Testimony Concerning Sarah Cecconi's Alteration Of Documents, Document
                     Review and Document Production.**

18               **1.      Testimony of Sarah Cecconi and Ms. Korb.**

19         Both Sarah and Ms. Korb testified that they had never seen a copy of Trustee's document

20  request before reviewing documents in Sarah's possession for production.  Exh. DG; TT 1668:13-

21  1669:3 (Sarah).  Sarah also did not see the meet-and-confer letter (Exh. DM) from Trustee's

22  counsel asking for specific documents that had not been produced.  TT 1918:3-16.  In addition,

23  Sarah had no discussions with Ms. Korb about which documents should be produced.

24  TT 1919:25-1920:2; TT 1928:13-15.  Sarah did not look for escrow instructions relating to the

25  purchase of the Pebble Beach Property as requested in Trustee's counsel's letter.  Exh. DM.

26  TT 1742:22-24.  The insurance documents, many of which were whited out, were produced only

27  in response to the meet-and-confer letter in which Trustee's counsel identified several categories

28  of documents not included in her production. TT 2290:23-2291:13; Exh. 88.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

Sarah was never instructed about discovery production by counsel and basically did not look through the boxes of documents she had received from Ms. Korb in 1998 documenting the various transactions concerning the Property from its acquisition until her father's death in 1997. TT 1733:25-1734:10; 1918:3-16.  Instead, she hired Ms. Korb to come to California by January 2003 to look through those boxes (Exh. BY ¶¶ 37 and 39) for documents "tracing use of Sarah's separate property funds." Exh. BY ¶ 39; TT 867:21-868:2.  Trustee's document request was not served until April 2003 and was never seen by Sarah or Ms. Korb.  TT 1668:13-1669:3; Exh. DG. Sarah also testified that she had not made any search for documents at her residence in Venice and suggested that she didn't have any there because there was "no room" in the four-bedroom house.  TT 2054:21-2055:2.  TT 1698:22-25 and 1701:12-18.

Although Sarah communicated with Ms. Korb and her father by mail and facsimile during 1985 through 1997, no facsimiles, correspondence or other documents between Mr. Coleman or Ms. Korb to Sarah or Enzo were produced before trial.  At trial, one letter from Mr. Coleman dated December 22, 1993 (Exh. 172) and two letters from Sarah to Ms. Korb and Mr. Coleman respectively dated January 29 and January 24, 1994 (Exhs. 170 and 171) were admitted in evidence over Trustee's objection that they had not previously been produced.  Sarah also produced after the commencement of trial, but not in discovery, a few letters Ms. Korb sent to Enzo's restaurants requesting interest payments.  Exh. 174.  These documents were also admitted over Trustee's objections.  The only document Enzo produced was a copy of the Residential Trust.  Exh. DJ.

According to Ms. Korb, Sarah whited out Enzo's name on documents showing his ownership of the Property after Ms. Korb pulled the documents from Sarah's files.  TT 820:6-821:20.  Sarah testified that she whited out Enzo's name because Enzo was not an owner of the Property, the insurance is for her home, she pays the insurance premiums and she was mad at Enzo and at the Royal Bank for coming after her.  TT 1930:6-24; Exh. DP.  Ms. Korb also testified that Sarah altered other documents by making various checkmarks and other notations on the bank reconciliation records that were not on the documents when she shipped them to Pebble Beach from Florida.  Ms. Korb generally typed explanatory statements.  TT 932:25-935:19;

S HARTSIS  F RIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

941:13-942:1; 870:13-14; 939:8-10.  *See generally* Exhs. 59A-71A, as submitted at trial, and Exhs. 59B-71B as produced to Trustee in discovery.

### 2.    Testimony of Sarah's Trial Attorney Elaine Seid.

On the last day of trial, Sarah called one of her trial attorneys, Elaine Seid ("Ms. Seid") to testify.  On direct examination, Ms. Seid confirmed that she had told Sarah that it was okay to white-out personal information but did not know about the white-outs of Enzo's name.  Ms. Seid testified that she did not discuss production with Sarah, but only with Ms. Korb.

On cross-examination, Ms. Seid acknowledged that she did not herself review, nor did anyone from her office review, Mrs. Cecconi's files to assure that all responsive documents in Sarah's possession, custody or control were produced, nor did she tell Sarah not to alter any documents.  TT 2260:16-2261:8; *see also id.* at 2263:14; 2265:5-11.  Ms. Seid also testified that she knew Sarah was hostile and angry about the litigation, but nonetheless relied on Sarah to select responsive documents.  TT 2265:16-18.  Ms. Seid could not confirm whether Sarah had withheld any documents harmful to her position but it "didn't occur" to Ms. Seid "that there would be harmful documents."  TT 2265:16-2266:16; 2310:8-11.  Ms. Seid acknowledged that it was possible that Sarah had redacted information from other documents that had been produced that had not yet been discovered and could not give any assurance that all responsive documents had been produced.  TT 2312:14-15; 2313:2-8.  Although trial was in recess frequently over the two-month period, and Trustee's counsel requested in writing that Sarah's counsel certify that all requested documents were produced and no other documents were altered, neither she nor anyone from her office conducted a further search.

## III.    THE BANKRUPTCY COURT'S MEMORANDUM DECISION AFTER TRIAL.

In its 84-page Memorandum Decision After Trial, the Bankruptcy Court found that Sarah had proved by clear and convincing evidence that she did not intend Enzo to have a beneficial interest in the Property when it was acquired in 1985 and that Enzo held his interest in the Property in a resulting trust for her benefit.  MD at 32-44.  The Bankruptcy Court also found that none of Sarah's subsequent acts terminated or extinguished the resulting trust and that Sarah's and her counsels' failure to conduct a thorough search for documents and Sarah's alteration of

Shartsis  Friese  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1   documents did not warrant terminating or adverse inference sanctions.  The Bankruptcy Court's

2   findings of fact and conclusions of law are discussed below in connection with each issue raised

3   on appeal.

4                                              **ARGUMENT**

5        The Bankruptcy Court findings do not support its conclusion that Sarah did not intend

6   Enzo to have a beneficial interest when she acquired the Property and took title as community

7   property in 1985.  The Court found that Sarah could not explain why she took title jointly with

8   her husband in 1985 and had no recollection of why or how it came about.  The Court found, and

9   Sarah testified, that she had no express agreement with Enzo as to their joint ownership or any

10  specific understanding concerning the Property, but had only a general understanding that "what

11  was hers was hers and what was his was his."  The Bankruptcy Court found that Sarah did not

12  pay attention to her financial or legal affairs and both she and Enzo signed documents without

13  reading them.  Based on these findings, the Bankruptcy Court rejected all of the contemporaneous

14  written evidence in which Sarah and Enzo acknowledged their joint ownership as irrelevant to

15  whether she intended to give Enzo a beneficial interest.  The Bankruptcy Court's finding of a

16  resulting trust is clearly erroneous for reasons discussed in Section I below.

17       The Bankruptcy Court also concluded that none of Mrs. Cecconi's actions following the

18  acquisition of the Property terminated the resulting trust.  The Bankruptcy Court's conclusions

19  are erroneous as a matter of law.  First, even if a resulting trust arose in 1985, it was extinguished

20  by the express trust (the Residential Trust) created in 1998 for the reasons explained in Section II

21  below.    Second, Sarah's ratification of Enzo's community property interest in 1998 also

22  precluded a resulting trust or transmuted Enzo's interest to community property in 1998 for the

23  reasons discussed in Section III below.  Third, the reimbursement of Sarah's acquisition costs by

24  the joint obligation loan and mortgage in 1990 and her ratification of her community property

25  interest in 1994 by the transfer to her Living Trust with Enzo's consent also terminated any

26  resulting trust for the reasons explained in Section IV below.

27       Finally, the Bankruptcy Court's erroneous findings and conclusions that terminating or

28  adverse inference sanctions are not warranted by the facts or applicable law are discussed in

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1   Section V.   For all of the reasons discussed below, the Judgment should be reversed and

2   Judgment entered in Trustee's favor.

3   **I.      THE BANKRUPTCY COURT'S CONCLUSION THAT SARAH ESTABLISHED
          A RESULTING TRUST BY CLEAR AND CONVINCING EVIDENCE IS
4          CLEARLY ERRONEOUS.**

5          **A.      Presumptions and Burden of Proof.**

6          The owner of legal title to real property (here Sarah and Enzo) is presumed by California

7   law to be the owner of the full beneficial title, and the presumption can only be overcome by clear

8   and convincing proof.   Cal. Evid. Code § 662; Fed. R. Evid. § 302.   *See G. R. Holcomb Estate*

9   *Co. v. Burke*, 4 Cal. 2d 289, 299 (1935); *Gomez v. Cecena*, 15 Cal. 2d 363, 366-67 (1940);

10  *Keene v. Keene*, 57 Cal. 2d 657, 665 (1962).   Where the evidence is doubtful, or there is a

11  reasonable contrary inference to be made regarding the parties' intent, the evidence is insufficient

12  to meet this burden.   *Rench v. McMullen*, 82 Cal. App. 2d 872, 874-75 (1947).

13         The California Supreme Court has described the clear and convincing standard of proof to

14  require "evidence be so clear as to leave no substantial doubt and sufficiently strong; to command

15  the unhesitating assent of every reasonable mind."   *In re Angelia P.*, 28 Cal. 3d 908, 919 (1981).

16  *See Copp v. Paxton*, 45 Cal. App. 4th 829, 846 (1996); *Roberts v. Ford Aerospace & Comm.*

17  *Corp.*, 224 Cal. App. 3d 793, 804 (1990); *Inamed Corp. v. Medmarc Cas. Ins. Co.*, 258 F. Supp.

18  2d 1117 (C.D. Cal. 2002).   *See also* G. T. Bogert, *The Law of Trusts and Trustees* (2d ed. 1991),

19  Resulting Trusts, section 464 ("Some courts have stressed that the proof must show a case

20  consistent with nothing else except the claimed resulting trust.   And if the testimony when fairly

21  construed, is consistent with any reasonable theory which will allow legal title to stand, no trust

22  will be declared.").

23         Under California law, a gift is presumed when property is purchased by one person and

24  title is taken in whole or in part in the name of another if the grantee is a child or other natural

25  object of bounty of the person who paid for the Property.   *Gomez v. Cecena*, 15 Cal. 2d 363, 367

26  (1940); *Altramano v. Swan*, 20 Cal. 2d 622, 628 (1942).   The Bankruptcy Court erroneously held

27  that a gift is not presumed under California law when, as here, property is purchased with the

28  wife's separate funds and title is taken jointly with the husband but only when the husband pays

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

1    for the property and takes title in the wife's name.  MD at 48.  The Bankruptcy Court erred by

2    refusing to apply the gift presumption in this case.

3
4
       **B.    The Bankruptcy Court's Conclusion That The California Gift Presumption
              Does Not Apply In This Case Is Erroneous As A Matter Of Law.**

5        When property is purchased by one person and title is taken in whole or in part in the

6    name of another, or jointly as it was here, a gift is presumed if the grantee is a child or other

7    natural object of bounty of the person who paid for the property.  *See Gomez v. Cecena*, 15 Cal.

8    2d 363, 367 (1940); *Lloyds Bank California v. Wells Fargo Bank,* 187 Cal. App. 3d 1038 (1986);

9    *see also Altramano v. Swan*, 20 Cal. 2d 622, 628 (1942); *Rossiter v. Schultz*, 43 Cal. App. 716,

10   717 (1919); *Restatement of Trusts (Third) (2003)*, § 9(2).

11       The California Supreme Court in *Gomez v. Cecena*, 15 Cal. 2d 363, 367 (1940) held that

12   "[e]ven where it is satisfactorily established that all or part of the purchase price was furnished by

13   one other than the grantee, if it appears in addition that the grantee was a child or other *natural*

14   *object of bounty of the person who made the payment*, it will be presumed that a gift was

15   intended."  *Id*. (emphasis added).  That Sarah's husband was an object of her bounty was clearly

16   established at trial.   The presumption of a gift or advancement rebuts the presumption of a

17   resulting trust.  *Lloyds Bank,* 187 Cal. App. 3d at 1043.  *See also Rossiter v. Schultz*, 43 Cal. App.

18   716, 717 (1919) (presumption of a resulting trust "does not arise where the parties concerned are

19   husband and wife or parent and child.  In such case the presumption is that the purchase and

20   conveyance were intended to be an advancement. . . .").

21       The Bankruptcy Court nonetheless held that the presumption of a gift does not apply when

22   the wife pays for property and puts title in her husband's name but applies only when the husband

23   pays for property and puts title in his wife's name.  The gender-based gift presumption applied by

24   the Bankruptcy Court is contrary to the equal protection provisions of the United States

25   Constitution, the California Constitution and California public policy as expressed in many

26   statutory enactments.    California Constitution Article 1, Section 7, and the Fourteenth

27   Amendment of the United States Constitution prohibit discrimination based on gender.  The

28   United States Supreme Court in *Oyama v. California*, 332 U.S. 633, 641 (1948), held that the

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

1    presumption of a gift applied to a child without regard to his lineage and reversed a resulting trust

2    in favor of the father based on lineage discrimination.    The sample principle applies to gender

3    discrimination.    *See also* California Fair Employment and Housing Act, Cal. Govt. Code

4    §§ 12900 *et seq.*; Unruh Civil Rights Act, Cal. Civ. Code § 51.    While older California resulting

5    trust cases were decided when the property rights of women were governed by various statutes

6    that no longer exist, if faced with the direct question whether to apply a presumption that favors

7    one gender over the other, the California courts would undoubtedly follow the equal protection

8    provision of the California Constitution and the general rule set forth in the *Restatement of Trusts*

9    *(Third)* § 9 (2003),[5] which reflects the law in the majority of states that have directly considered

10   this gender-based question.

11           The issue of whether a gift is only presumed when the husband pays but not when the wife

12   pays was not considered or decided in *Socol v. King*, 36 Cal. 2d 342 (1950) or in the earlier cases

13   on which the Bankruptcy Court relied.    The California Supreme Court simply noted in its opinion

14   in *Socol*:    "It is true that the presumption of a resulting trust (Civil Code, § 853) arises where title

15   to property is taken in the name of the husband and consideration for the transfer is furnished by

16   the wife [citations omitted]."    *Id.* at 348.    The Supreme Court in *Socol* relied on earlier cases such

17   as *Shaw v. Bernal*, 163 Cal. 262 (1912) in which the *husband* purchased property with his wife's

18   funds and put his name on title without his wife's knowledge or consent and a resulting trust was

19   declared.    In *Owings v. Laugharn*, 53 Cal. App. 2d 789 (1942), the husband used the wife's funds

20   and placed title in his own name for convenience by an agreement with the wife that the Property

21   was hers, and that he would convey it to her upon request.

22           While the language in *Socol, Owings* and *McKinnon v. McKinnon*, 181 Cal. App. 2d 97

23   (1960), could be interpreted to approve a gender-biased gift presumption, these cases relied on

24   Civil Code section 853 (repealed in 1986) and other outdated statutory provisions protecting

25   women.    To interpret these cases as gender-biased ignores the Supreme Court's clear statement in

26

27   ―――――――――――――
     [5]       The *Restatement of Trusts (Third)* rejected the majority rule as expressed in Restatement
28   of Trusts (Second) § 442, comment *a*, as no longer appropriate.    *See* Reporter's Notes on § 9,
     comments *b* and *c*, citing 23 Cornell L.Q. 476.

Shartsis  Friese  llp
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1    *Gomez v. Cecena*, 15 Cal. 2d 363, 367, that a gift is presumed if the grantee is "a child or other

2    natural object of bounty of the person who made the payment." There is no doubt that the

3    California courts would apply a non-discriminatory gift presumption if presented with the

4    question, and the Bankruptcy Court's conclusion that California law applies a gender-biased gift

5    presumption is clearly erroneous.

6

7    **C.    There Was No Evidence That Sarah Intended In 1985 When Title Was Taken As Community Property That Enzo Would Not Have A Beneficial Interest.**

8    To establish a resulting trust, Sarah had to prove both that she acquired the Property in

9    1985 with her separate funds <u>and</u> that she did not intend Enzo to have a beneficial interest. Cal.

10    Evidence Code § 662; *Socol v. King*, 36 Cal. 2d 342 (1950); *Altramano v. Swan*, 20 Cal. 2d 622

11    (1942). Proof of payment from separate funds alone is not sufficient. *See Gudelj v. Gudelj*, 41

12    Cal. 2d 202, 212 (1953) ("[T]he presumption arising from the form of the deed may not be

13    rebutted solely by evidence as to the source of the funds used to purchase the property.");

14    *Knego v. Grover*, 208 Cal. App. 2d 134, 142 (1962) (presumption that parties intended to hold

15    property in the manner indicated by title may not be overcome solely by evidence of the source of

16    funds used to acquire property); *Trimble v. Coffman*, 114 Cal. App. 2d 618, 622 (1952) ("Such

17    findings [that the funds used to purchase property were the separate property of one spouse]

18    would not, however, be conclusive evidence that a resulting trust was, in fact, created.")

19    Where a community property interest is denied after many years of being treated as

20    community property to defeat the claims of creditors, "[t]he *ipse dixit* of the parties in such cases

21    even if not contradicted by their own actions means very little." *In re Freitas*, 16 F. Supp. 557,

22    560 (S.D. Cal 1936). Yet the Bankruptcy Court in this case relied entirely on the oral testimony

23    of Sarah and Enzo and disregarded their many actions and contemporaneous written evidence that

24    are inconsistent with any intent for Sarah to have full beneficial interest in the Property.

25    **1.    The Bankruptcy Court's Findings As To The Source Of Payment.**

26    Trustee agrees that Sarah paid the initial purchase price of $610,000 by a loan secured by

27    her stocks. The Bankruptcy Court's finding that Enzo contributed nothing to the improvements,

28    however, is contrary to the evidence. The Bankruptcy Court attributed Enzo's deposits of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

$200,000 in 1988 and $100,000 in 1999 into Sarah's account as repayment of the Florida Bank Notes (Exhs. 14 and 17).  MD at 52-54.[6]  The Court's finding that the $300,000 borrowed by Enzo from the Royal Bank and wired to Sarah's Florida Bank account was not used for improvements is clearly erroneous given Enzo's contradictory testimony, the numerous contemporaneous business records of the Royal Bank reporting his stated purpose and Enzo's admission that the $300,000 he borrowed was at least indirectly used for the improvements because that is the only reason he wired the funds to Sarah in 1988 and 1989.  TT 349:19-351:7.  There was no written or other evidence that Enzo directed Sarah or Ms. Korb to apply the $300,000 he wired to her account to repay the Florida Bank Notes.

## 2.    The Bankruptcy Court's Findings As To Sarah's Intent.

The Bankruptcy Court's finding that "Enzo and Sarah did not own any property together" (MD at 12:26) is clearly erroneous.  It was undisputed that Sarah and Enzo always held the Property jointly as community property from the date of its acquisition.  In contrast, Sarah's stock portfolio in the United States and her securities account in Zurich, Switzerland were her separate property and were always clearly **held** as her separate property.  Enzo's restaurant interests in London and Paris were his separate property and were always clearly **held** as his separate property.

There was no evidence that Sarah intended in 1985 for Enzo to hold his interest in trust for her.  Sarah did not recall why she took title as community property in 1985.  She testified:  "I don't remember.  1984, 1985, 1986, 1987, I don't remember any of that. . . .  It's a complete washout in my mind. . . . "  TT 1734:11-20.[7]  Sarah testified unequivocally that she never had any agreement with Enzo and never discussed ownership of their property in general or the Pebble Beach Property in particular.  TT 1637:14-19.  Both she and Enzo testified that they understood that what was Sarah's was Sarah's and what was Enzo's was Enzo's.  The Bankruptcy

---

[6]    The admission into evidence of these Notes was an abuse of discretion because they were not produced prior to trial and adversely affected the presentation of Trustee's case.

[7]    Sarah's Post-Trial Brief relied largely on assumptions not facts—using the words "presumably," "most likely," "suggested that," "assumed that," "entirely possible that," "apparently believed," "might have believed," "most likely assumption," "appears to be" and "it is plausible that."  *See* Cecconi Joint Post-Trial Brief, CR 174 at 16, 18, 20 and 21-23.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    Court found that they had such an understanding (MD at 13:2-5), but that understanding is an

2    irrelevant truism that begs the question.    Unlike all of their other property which is held

3    separately, the Pebble Beach Property was specifically held jointly as "community property"—

4    not as Sarah's separate property.

5        There was no evidence that in 1985 Sarah had any understanding that "record title" did

6    not convey a beneficial interest.  As the Bankruptcy Court found, Sarah paid no attention to legal

7    matters, did not read the documents she signed and doesn't recall who advised her or gave the

8    instruction to take title as community property.  MD at 1689:16-19.    Sarah's sworn pre-trial

9    declarations indicate that she decided herself to take title as community property, and there is no

10   evidence (other than her subsequent lack of recollection) that she did not.  Exh. BK.  Sarah could

11   not recall whether her father advised her to take title as community property (TT 1843:10-13), but

12   it is clear from her and Ms. Korb's testimony that with Sarah's authority her father handled every

13   aspect of her acquisition and development of the Property and that he is the only other person

14   who could or would have directed title to be taken as community property if she did not do so.

15       The Bankruptcy Court's conclusion that the evidence submitted by Trustee to show joint

16   ownership was based purely on "record title" is clearly erroneous.  MD at 44-50.  The Bankruptcy

17   Court based this conclusion on its findings and found that contractors and other agents retained by

18   the Cecconis in connection with the development of the Property "assumed" Enzo was an owner

19   based solely on "record title." *Id*. at 17-18.  But there is no evidence in the record to support this

20   finding.   None of the contractors or agents retained by the Cecconis and referred to by the

21   Bankruptcy Court in its Decision testified at trial, and the only evidence that was produced

22   showed that they took their directions directly from, and based their understanding on, Mr. and

23   Mrs. Cecconi.  *See, e.g.*, Exh. L.

24       Similarly, the Bankruptcy Court's finding that Sarah's attorney, Mr. Sanders, "assumed"

25   Enzo was an owner based solely on "record title" is clearly erroneous.  No evidence supports that

26   assumption, and the evidence was to the contrary.  Sarah testified that Mr. Sanders probably

27   prepared the community property deed to the Townhouse in 984.  TT 1839:21-24.  Mr. Sanders

28   advised Sarah at a meeting in 1993 and in writing thereafter to have Enzo reimburse her for his

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1   share of the costs of the Property.  There is no basis in the record for the Bankruptcy Court's

2   assumption that Sarah's lawyer had no knowledge of their joint ownership when he was

3   specifically providing face-to-face legal advice to her concerning their joint ownership.  Exh. AY.

### D.    Sarah's Stated Purpose For Taking Title As Community Property Is Inconsistent With Separate Property Ownership.

In a pretrial declaration Sarah stated:  "I placed title in my husband's name for estate planning purposes."  Exh. BK.  Enzo filed a similar declaration stating that his interest was placed on title for "estate planning purposes."  Exh. BL.  Sarah has had attorneys providing her with estate planning advice since at least 1983.  *See* Exhs. 114, 115 and 118-134; TT 878:25-879:3; TT 1350:2-12.  The impetus for Sarah's estate planning was avoidance of "huge" taxes. TT 1683:10-18.  She was worried that taxes would be "astronomical" if Enzo had to sell the Property after her death.  TT 1910:7-17.  Mr. Cecconi confirmed his wife's estate planning purpose in his interrogatory responses:  "My wife wanted to make certain that the property of the trust would go to me upon her death *without a tax burden*."  Exh. BN at 7 (emphasis added); TT 1062:9-1063:6 (confirming truth of statement in interrogatory response).

There was no estate planning benefit or tax benefit by holding the Property as community property absent beneficial ownership by both spouses, and Sarah never gave any reason for Enzo just to hold record title or even that she knew there was any difference.  Mr. Hawley, an estate planning attorney on whom Mrs. Cecconi relied in 1994 and 1998, recommended the steps she should take to minimize any tax burden, and the Cecconi Residential Trust was created to achieve her goal of avoiding "huge taxes."  TT 1683:23-1684:2.  Sarah also had advice from her attorneys or father prior to 1985 when she took title to the Townhouse as community property.

There are well recognized "distinct advantages to the ownership of community property by a husband and wife."  2-81 California Wills & Trusts, § 81.04.  The advantages are summarized in 2-111 California Wills & Trusts, § 111.05:

> On the death of one spouse, only one half of the community property is included in the gross estate of the deceased spouse for estate tax purposes.  The other half belongs to the surviving spouse and is not included in the deceased spouse's gross estate.  Further, both halves of the community property will receive a "stepped-up" basis when one spouse dies, so that any sale after the death of the first spouse will

SHARTSIS  FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1    result in less gain for income tax purposes.

2         Sarah Cecconi did not identify any tax or estate planning benefit from owning the

3    Property as her separate property because it is evident that Sarah would have obtained no tax

4    benefit or achieved any other estate planning goal by retaining the full beneficial interest as her

5    separate property.   Moreover, there would have been no reason to create the Residential Trust.

6    Sarah offered no evidence to explain, or could explain, why she went to the expense of creating

7    the Residential Trust to hold the Cecconis' community property.  If she intended to retain full

8    beneficial ownership as her separate property, she could have contributed the Property to her

9    existing Living Trust, but on the advice of her attorney she did not do so.  The reason is clear:

10        When spouses wish to preserve the community and separate character of property
        transferred to a revocable inter vivos trust, it is common to create separate trusts
11        for the separate property and the community property. . . .  When the separate trust
        for the community property complies with the requirements of *Fam. Code*
12        *§ 761(a)*, the community property will retain its character as community property
        in the trust.

13

14   2-111 California Wills & Trusts, § 111.05.   The Residential Trust complies with the Family

15   Code, section 761(a).

16        Sarah testified that she intended to follow her lawyer's legal advice to obtain the tax

17   benefits she wanted.   The benefits are clear but depend on each spouse having beneficial

18   ownership:

19        A special provision of the income tax law confers a distinct advantage on
        community property that is not enjoyed by separate property.  This is the "double
20        stepped-up" basis rule of *I.R.C. § 1014(b)(6)*.  The general rule is that, for income
        tax purpose, the basis of property acquired from a decedent is the fair market value
21        of the property at the decedent's death.   In the case of community property,
        however, the surviving spouse's half as well as the deceased spouse's half is
22        revalued at the fair market value as of the decedent's death.   This may result in
        significant income tax savings if the property is sold after the death of the first
23        spouse. . . .

24   1-3 California Wills & Trusts, § 3.04.

25        While Mrs. Cecconi would not admit that she put Enzo's name on title with an intent to

26   convey a beneficial interest, she could not have had any other intent in 1985 or in 1998 because if

27   the property remained her separate property, she would not have met any of her estate planning

28   goals.  No other reason was ever offered for her doing so.  Whether or not she understood all of

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

the other legal effects of owning property jointly isn't relevant to her intent. California law presumes that legal title includes beneficial ownership, and Sarah Cecconi could not have enjoyed any tax or estate planning benefits—which was her stated intent—unless both spouses have beneficial ownership of the Property as community property at the date of death.

### E.    The California Resulting Trust Cases Do Not Support A Resulting Trust On The Facts Of This Case.

The Bankruptcy Court relied on three cases in concluding that a resulting trust had been established by Sarah: *Jones v. Kelley*, 121 Cal. App. 2d 130 (1953); *Owings v. Laugharn*, 53 Cal. App. 2d 789 (1942); and *Seabury v. Costello*, 209 Cal. App. 2d 640 (1962). MD at 57-60. However, all three cases found a resulting trust based on an express oral agreement at the time the property was acquired. It is undisputed that there was no express oral agreement in this case.

In *Jones v. Kelley*, 121 Cal. App. 2d 130 (1953), a resulting trust was declared based on an oral agreement at the time the residential property was acquired by the wife with her separate property. She initially had the papers drawn up for title to be held in her name as her separate property, but thereafter reached an agreement with her husband that she would put title in joint tenancy so that the survivor of them would get the property on the death of the other—bypassing the children that each had by a former marriage. Contrary to the agreement, the husband broke the joint tenancy just prior to his death by deeding his one-half interest to his daughter. The court found: "The controlling question here is whether the wife intended to limit her gift represented by the deed in joint tenancy, and whether her husband agreed to take the deed subject to such limitation." *Id*. at 134. The court found a resulting trust based on the agreement. The court considered the joint tenancy deed to be a gift by the wife to her husband, but a gift that had a limitation which he had breached. *Id*. at 134.

In *Owings v. Laugharn*, 53 Cal. App. 2d 789 (1942), the husband purchased property in California with his wife's money and put title in his own name at her direction and with her consent as she was ill and lived in Nebraska. While title was taken in the husband's name alone, the spouses agreed that when she recovered, he would transfer title to her upon her request. When her husband went into bankruptcy, the wife brought an action to quiet her title to the

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

property based on their agreement, and the court held that the property was her separate property.

In *Seabury v. Costello*, 209 Cal. App. 2d 640 (1962), two sisters entered into an oral agreement when property was acquired that the non-contributing sister would have no beneficial interest in the property and would live on the property rent-free and care for their elderly mother. The sister who paid for the property traveled extensively and was concerned that she would predecease her mother. She wanted her sister to have the property by right of survivorship to avoid litigation and expense so that the non-contributing sister could continue to take care of their mother. The Court found a resulting trust in favor of the sister who paid for the property based on this contemporaneous agreement.

*Jones, Owings* and *Seabury* are distinguishable from this case because there was no evidence of any agreement between Sarah and Enzo at the time the Property was acquired and title taken jointly, and there was no evidence of any purpose for the joint ownership if a beneficial interest was not intended. The Cecconis' agreement is reflected in the Residential Trust, and that agreement is consistent with Sarah's actions from 1985 forward that she intended Enzo to have both legal and beneficial ownership and made no distinction between the two. The Bankruptcy Court's conclusion that the general understanding that Enzo's property is Enzo's and Sarah's property is Sarah's is a truism that is irrelevant because it doesn't answer, but simply begs, the question. In general, all of Enzo's and Sarah's separate property was <u>held</u> as separate property, but they always owned the Pebble Beach Property jointly as community property.

The only support for Bankruptcy Court's finding that Sarah intended Enzo to hold "record title" is pages of argument submitted by Sarah in her post-trial briefs that Sarah

> . . . [T]he fact that there were many documents introduced at trial which reflected the state of title did nothing to improve [Trustee's] case. In the context of a claim for a purchase money resulting trust, the fact of title means virtually nothing. Here, the "nothing" of title, multiplied by the many title documents and documents derivative of title relied upon by the bank, still equals nothing.

CR 174 at 49. Sarah's position throughout has been that a resulting trust is presumed if she proves that she paid for the Property, and that Trustee has the burden to prove she intended a gift. CR 174 at 14:8-9; CR 198 at 21:24-22:2. Her position ignores the California law that title includes both legal and beneficial interests. There is no evidence from any of the countless agents

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

Sarah hired that they were relying on "record title" rather than on their direct dealings with the Cecconis concerning their co-ownership. While the Bankruptcy Court also relied in part on testimony that Sarah exercised control over the development of the Property (MD at 68-69), Sarah's management of the Property is entirely consistent with community property ownership. *See* Cal. Fam. Code § 1102; *Finalco, Inc. v. Roosevelt (In re Roosevelt)*, 87 F.3d 311, 314-15 (9th Cir. 1996).

Finally, there was no evidence that title was placed in Sarah and Enzo's ownership jointly by someone other than Sarah. While Sarah testified at trial that she had no recollection of taking title as community property in 1985, her earlier sworn declaration stated that she took title as community property for estate planning purposes. Exh. BK, ¶ 6. Those estate planning purposes are entirely inconsistent with Enzo holding only bare legal title, and there is no testimony or other evidence that Sarah knew that "record title" meant anything different than beneficial title, and under California law, it does not. But even if Sarah did not personally direct title to be taken jointly, the evidence shows it could only have been done at the direction of her father, whom she authorized and trusted. The Bankruptcy Court found that "Sarah unconditionally trusted her father and Ms. Korb with her finances." MD at 12:1-2. Mr. Coleman (and Ms. Korb) knew title was taken as community property because he saw the deeds and provided assistance to Sarah and Enzo throughout the development process and with their permanent financing in 1990 and refinancing in 1993. The Bankruptcy Court's finding that Sarah's father would not have had Sarah take title to the Property as community property is contrary to the evidence, and based solely on inadmissible hearsay testimony of Ms. Korb—admitted over Trustee's objections—that Mr. Coleman was concerned about Enzo's "spending habits." TT 409:12-410:3. But, there was no evidence of Enzo's "spending habits" or any financial issues with Enzo before 1990 and certainly none in 1985. The evidence showed that Mr. Coleman knew and approved of Enzo's community property interest as did the attorneys Mr. Coleman retained on Sarah's behalf, such as Mr. Sanders. Exh. AY. Moreover, the evidence of Sarah's ratification of her father's actions is clear and unequivocal.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

**F.    The Evidence Unequivocally Established That Sarah Cecconi Had Actual Knowledge Of The Actions Taken On Her Behalf, And She Approved And Ratified Those Actions.**

Sarah had actual knowledge that title was taken jointly with Enzo from the outset, and there is no evidence that Mr. Coleman acted without express authority. The Bankruptcy Court found the documents showing his joint ownership just "didn't mean anything to her." MD at 62:20-24. Even if Mr. Coleman did not inform Sarah of how title was held, she had sufficient information that it was held jointly to put her on inquiry notice, and she therefore had a duty to investigate. By failing to take any corrective action for 16 years, she ratified her father's and her other agents' acts. Cal. Civ. Code § 2307. *See also* Cal. Civ. Code § 2311. *See Navrides v. Zurich Insurance Co.*, 5 Cal. 3d 698 (1971); *Rakestraw v. Rodrigues*, 8 Cal. 3d 67 (1972); *Bissell v. King*, 91 Cal. App. 420, 428 (1928); Rest. 2d., Agency § 83). Thus, even if Mrs. Cecconi never instructed anyone as to how title to the Property should be held, she was responsible for correcting title if it was incorrect. Because Sarah did not change title for over 16 years, repeatedly put Enzo Cecconi's name as co-owner on other material documents that she and Enzo both signed, she agreed to, or ratified and approved, Enzo's ownership as community property. Cal. Civ. Code § 2310.

**G.    Sarah's Lack of Understanding Or Knowledge Of The Legal Effect Of Her Actions or Actions Taken On Her Behalf Does Not Insulate Her From the Consequences Of Those Actions.**

The Bankruptcy Court found that "prior to being sued by the Royal Bank in 2001, it never occurred to Sarah that having Enzo reflected as an owner of the Property on any document could create rights in favor of his creditors against the Property." MD at 62-63. Even if Sarah was ignorant of the legal effect of community property ownership, the Bankruptcy Court's findings that Sarah "paid no attention to financial or legal matters" and "did not read documents" before signing them demonstrates that any ignorance was willful and does not relieve her of the legal consequences of her actions. *See Hutchinson Co. v. Gould*, 180 Cal. 356, 358 (1919) (lack of full knowledge irrelevant where notice was sufficient to put on inquiry); *Reusche v. California Pacific Title Insurance Co.*, 231 Cal. App. 2d 731 (1965) (principal liable for the acts of her agent despite her lack of knowledge of the transaction).

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1       Sarah trusted Mr. Coleman to handle all her finances and her estate planning from 1979

2   until her death in 1997.   TT 861:2-21; 1679:10-22; and 1737:2-4; Exh. 45.   She accepted his

3   judgment with respect to all aspects of ownership of both the Townhouse and the Pebble Beach

4   Property, and she subsequently accepted the advice of her own attorney in Monterey County to

5   create the Residential Trust with their community property as its only assets.   Under California

6   law, Sarah is bound by her and Mr. Coleman's actions whether she understood their legal effect

7   or not.   If the law were otherwise, there would always be an incentive for parties to claim that

8   they didn't pay attention, read, or understand important documents that they signed.   Sarah's

9   ignorance of the legal effect of her actions does not relieve her of those effects.   *See Gudelj v.*

10  *Gudelj*, 41 Cal. 2d 202, 212 (1953).

**II.    THE CECCONIS EXECUTION OF THE CECCONI RESIDENTIAL TRUST AND CONVEYANCE OF THE PROPERTY TO THE RESIDENTIAL TRUST TERMINATED ANY PRE-EXISTING RESULTING TRUST.**

13      Assuming that a resulting trust arose in 1985, it was extinguished by the creation of the

14  Residential Trust and the transfer of the Property to the Residential Trust.

**A.    The Residential Trust Is An Express Trust And Extinguished Any Resulting Trust In The Same Property.**

17      Under California law, a resulting trust (which is an implied trust) does not arise and

18  cannot exist where the parties have entered into an express trust concerning the same property.

19  *See Bayles v. Baxter*, 22 Cal. 575, 579-80 (1863) (finding no express trust because not in writing,

20  but a resulting trust implied under the circumstances).   "A resulting trust is the mere creature of

21  equity . . . and it cannot therefore arise where there is an express trust declared by the parties, and

22  evidenced by a written declaration of such express trust."   *Id.* at 579-80, quoting [*Jackson ex.*

23  *dem. Walton and Dubois v. Leggett*, 5 Paine 117, 1831 N.Y. LEXIS 157 (1831).   Since the

24  Property could not be held at the same time in both a resulting trust and in an express trust, the

25  written express trust by Mr. and Mrs. Cecconi in 1998 extinguished and superseded any implied

26  trust that arose in 1985.

27      The Bankruptcy Court's finding that "there is no evidence that Sarah's execution of the

28  Residential Trust is an agreement to a different trust from what would be implied in law"

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

(MD at 70-71) is clearly erroneous.   First, the Residential Trust is a trust over "community property," not separate property.  Exh. BD.  Sarah's separate property, including her share of the community property, was held in her Living Trust.  Second, the Residential Trust Agreement and California trust law imposed numerous duties and obligations on both Enzo and Sarah as Trustees as well as other conditions and restrictions that are not "implied" in a resulting trust.  *Id*.  Third, the written express trust declared the Property to be community property, superseding or extinguishing any "implied trust" over the same Property if one ever existed.   Fourth, the Residential Trust acknowledged Property's prior status as community property and specifically provided that it would *continue to be community property* even if the Trust was revoked.  *Id*. (emphasis added).

The Bankruptcy Court also found:  "There is no evidence that Sarah gifted any part of her full beneficial interest in the Property to Enzo in executing the Cecconi Residential Trust."  *Id*. at 71.  This finding is inconsistent with Sarah's burden of proof, and suggests that the Bankruptcy Court applied the presumption of a resulting trust in this case contrary to Evidence Code section 662.  The Trustee did not have the burden to prove that Sarah gifted the Property to Enzo.  Sarah had the burden of proof that Enzo did not have a beneficial interest.  California law presumes he had a beneficial interest because title was held in his name as community property.  *See* Evidence Code § 662(a).  California law also presumes a gift when a spouse pays for the property but takes title jointly with the other spouse.  *See* Section I.B. above.   Moreover, the conclusion of the Bankruptcy Court that "there is no evidence that Sarah gifted" any interest to Enzo is clearly erroneous because the Residential Trust is clear and convincing evidence that Sarah intended Enzo to have a beneficial community property interest and therefore intended a gift.

While parol evidence is admissible to show that title documents do not reflect the intent of the parties under specific circumstances, the Residential Trust agreement executed by the Cecconis is not a title document and parol evidence is inadmissible to alter its terms.   The Residential Trust is a final unambiguous written agreement as to the terms stated and was fully executed by the transfer of the Property by both Enzo and Sarah to the Trustees of the Residential Trust in April 1998.   The agreement expresses the intent of the parties at the time of the

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

agreement and conveyance to the Trust by unequivocally declaring that they are co-owners of the Property and that the Property is their community property. Evidence of any oral agreement or other extrinsic evidence offered to vary or contradict any of the written terms is barred by the parol evidence rule. *See Gerdlund v. Electronic Dispensers International*, 190 Cal. App. 3d 263, 272 (1987) (If the written agreement appears on its face to be a final statement of the terms included in the agreement, then those terms cannot be contradicted by parol evidence); *Marani v. Jackson*, 183 Cal. App. 3d 695, 703 (1986) (same).[8] Any oral evidence offered to vary or contradict the Residential Trust would have been barred.

The Bankruptcy Court found that the Residential Trust did not alter the pre-existing resulting trust based solely on its conclusion that there was no transmutation of Sarah's separate property interest in Enzo's share under Family Code section 852(a), and, therefore, the express trust did not extinguish the resulting trust. MD at 72-82. This conclusion is clear error because transmutation is irrelevant to this issue. Since there cannot be both an implied trust and an express trust over the same property, and because the Residential Trust created duties arising under its terms and under California trusts law, the Residential Trust extinguished any resulting purchase money trust that arose in 1985 if it hadn't already been extinguished before 1998. Moreover, the Residential Trust expressly declared that the Property had previously been held as community property and was to continue to remain community property thereafter.

**B.    The Transfer Of The Pebble Beach Property To The Residential Trust At The Direction Of Sarah Cecconi Extinguished Any Pre-Existing Resulting Trust.**

Both California law and trust law generally hold that a conveyance of property at the direction of the beneficiary of a resulting trust extinguishes the resulting trust. Restatement (Second) Trusts, section 410(b) (relating to resulting trusts), states the general rule: "If a trustee of a resulting trust transfers the trust property to the beneficiary or at [her] direction, the resulting

---

[8] Although Trustee is not a party to the Residential Trust agreement, he has standing under California law to assert the parol evidence rule to bar admission of extrinsic evidence of intent contrary to the written terms of the agreement and he did so. CR 114. *See* Witkin, *California Evidence*, Documentary Evidence § 111 (2000); *Kern County Water Agency v. Belridge Water Storage District*, 18 Cal. App. 4th 77, 86 (1993); and *Neverkovec v. Fredericks*, 74 Cal. App. 4th 337, 350, n. 8 (1999).

Shartsis  Friese  llp
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

trust terminates." Similarly, *Scott on Trusts* explains in section 410 that a "resulting trust terminates when the transfer is made by the trustee to the beneficiary, or to another at the beneficiary's direction." W. Fratcher, *Scott on Trusts* § 410 (4th ed. 1989). These principles apply in this case and are illustrated by *Lowenthal v. Kunz*, 104 Cal. App. 2d 181, 184 (1951), which is directly on point:

> Respondent Adele concedes that immediately before she executed the joint tenancy deed she held the legal title, subject to an oral trust in favor of Pauline of an undivided one-half interest in the property. The evidence discloses and the trial court found, that Pauline requested [Adele] to execute and place of record a joint tenancy deed in which the two should be named as grantees with a right of survivorship. This oral request by Pauline when acted upon by Adele terminated the equitable right which Pauline had in the property. . . .

*Id.* at 184. *See also Zakaessian v. Zakaessian*, 70 Cal. App. 2d 721, 724 (1945) ("If a trustee of a resulting trust transfers the trust property to the beneficiary or at his direction, *the resulting trust terminates*.") (emphasis added).

Here, at Sarah's direction, Enzo conveyed his interest in the Property, which Sarah claims he held in a resulting trust for her benefit, to the Co-Trustees of the Residential Trust, just as in *Lowenthal* where Adele transferred her interest in the property previously held in a resulting trust at the direction of Pauline to her and Pauline by a joint tenancy deed. The Bankruptcy Court acknowledged *Lowenthal* but concluded that it did not apply based on its conclusion there was no proof of a transmutation. The conclusion that the transfer to an express trust at the direction of Mrs. Cecconi did not extinguish any resulting trust is clearly erroneous.

**III.    SARAH'S CONVEYANCE OF HER COMMUNITY PROPERTY INTEREST TO HER LIVING TRUST AND CREATION OF THE RESIDENTIAL TRUST RATIFIED ENZO'S BENEFICIAL INTEREST OR TRANSMUTED THAT INTEREST TO COMMUNITY PROPERTY.**

**A.    The Transfer Of Sarah's Interest In The Property To Her Living Trust Ratified Its Community Property Character.**

On Mr. Hawley's advice, in May 1994 Sarah executed a grant deed conveying her community property interest in the Property to herself as trustee of her 1984 Living Trust, which held all of her separate property. Exh. 125. In compliance with the Family Code Section, Enzo Cecconi also executed the deed or consent conveying Sarah Cecconi's community property interest to her Living Trust, and the deed was recorded in January 1995. *Id.* If Enzo had no

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9    4111

1   community property interest, his consent execution would not have been necessary.
2   Mrs. Cecconi's action, taken on the advice of her estate planning attorney, ratified Enzo's
3   community property interest.  If, as Sarah now claims, she considered the Property to be her sole
4   and separate property, she offered no evidence to explain why she transferred only her
5   community property interest to her Living Trust instead of the entire beneficial interest.

**B.    The Residential Trust Agreement Ratified Enzo Cecconi's Community Property Interest.**

8       Although the Bankruptcy Court found that Sarah did not pay attention to legal or financial
9   matters and that neither she nor Enzo read documents before signing them, their testimony and
10  the documents she signed unequivocally show that she had knowledge that the Property was held
11  as community property.  Their knowledge and understanding of the documents they signed are in
12  any event presumed as a matter of law.  *Wilson v. Coffey*, 92 Cal. App. 343, 349 (1928) (internal
13  citations omitted) ("A person is presumed to have knowledge of the contents of an instrument
14  executed by him or in his possession, and with the facts concerning which the recitals in the
15  instrument would put a prudent man upon inquiry.").  *See also Kimmell v. Skelly*, 130 Cal. 555,
16  561 (1900) (defendant's failure to read document in full before signing it not sufficient basis to
17  set it aside); *Hayman v. Commissioner of Internal Revenue*, 992 F.2d 1256, 1262 (2d Cir. 1993)
18  (spouse who signed tax returns without reading them charged with constructive knowledge of
19  their contents).  *See generally* Cal. Civ. Code § 19.

20      Whether Sarah and Enzo appreciated all of the legal implications of signing the
21  Residential Trust agreement or other documents does not affect their validity.  Sarah had
22  extensive ongoing legal advice and an opportunity to understand the legal implications of the
23  Residential Trust and grant deed before she signed them.  As the California Supreme Court held
24  in *Gudelj v. Gudelj*, 41 Cal. 2d 202, 213-14 (1953), a grantor's failure to comprehend the legal
25  effect of a deed does not affect its validity:

26      It is of no significance that [husband] was unaware of the legal effect of the deed.
        Nor is it material that the home was purchased primarily from [husband's] separate
27      funds, [wife] being aware of their source.  All of these facts, taken together,
        provide no basis for an inference of a mutual understanding or agreement between
28      [husband] and [wife] that the separate and community nature of the funds used in

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9   4111

1
2

the purchase was to be preserved.  Therefore, there being no substantial evidence tending to rebut the presumption created by the joint tenancy deed, the property is owned by the parties in joint tenancy.

3

*Id.  See also Butler v. Butler*, 188 Cal. App. 2d 228, 233-34 (1961).

4

Mrs. Cecconi acted on the legal advice of her estate planning expert.  She signed the

5

Residential Trust agreement and intended to take the benefits it provided.  Her friend and lawyer,

6

Gary Vandeweghe, testified that she was perfectly capable of handling her own financial affairs.

7

TT 2005:25-2006:7.    There was no evidence that she was not capable.    The evidence

8

demonstrated that the Residential Trust she created was a result of her intentional acts based on

9

the advice of legal counsel and other advisors, and she is bound by its terms.

10

The Bankruptcy Court's finding that Sarah and Enzo both understood that Enzo would

11

have only a life interest but would not "own" the Property if Sarah predeceased him and that upon

12

Sarah's death the Property would pass to Sarah's niece is irrelevant because it contradicts the

13

Residential Trust agreement.  MD at 30.  *See* Exh. BD.  Moreover, Sarah's testimony that she was

14

concerned that if Enzo had to sell the Property, he would incur huge taxes, is inconsistent with the

15

finding of a life estate and with Sarah's understanding of tax advantages.

16
17

**C.    If The Pebble Beach Property Was Separate Property, It Was Transmuted To Community Property At Sarah's Direction.**

18

The character of property can be "transmuted" (*i.e.*, changed) from separate, joint or

19

community property if the requirements of section 852 of the California Family Code are met.

20

Section 852(a) provides that "a transmutation of real or personal property is not valid unless made

21

in writing by an express declaration that is made, joined in, consented to or accepted by the

22

spouse whose interest in the property is adversely effected."  Cal. Fam. Code § 852(a).[9]  *See In re*

23

*Estate of MacDonald*, 51 Cal. 3d 262 (1990).  Mrs. Cecconi, as the adversely affected party,

24

expressly declared in the Residential Trust that the Pebble Beach Property "is the community

25

property" of her and her husband.  Nonetheless, Sarah argued and the Bankruptcy Court found,

26

_____

27
28

[9]    In fact, all of Mrs. Cecconi's actions with respect to the Pebble Beach Property and the Pebble Beach Townhouse from its acquisition in 1985 to the commencement of this litigation have complied with the California Family Code's provisions governing community property.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

that there was no transmutation of Sarah's beneficial interest in the Property because the Residential Trust agreement did not expressly state that its character or ownership was being changed from separate to community property—*i.e.*, it did not make reference to Sarah's claimed separate property interest held in trust by Enzo.  But the Residential Trust specifically indicated that the Property was already community property and that it would continue to be community property even if the Trust were revoked.  Exh. BD.

The language in the Residential Trust satisfies the statutory requirement of an "express declaration."  It expressly declares the Property "is community property" and was conveyed by a grant deed in which Sarah's Trust and Enzo granted, *i.e.*, gave, to "Giuseppe E. Cecconi and Sarah C. Cecconi, Co-Trustees of the Cecconi Residential Trust," all of their interest in the Pebble Beach Property.  Exh. BC.  Thus, the Residential Trust and the grant deed constitute an "express declaration" within the meaning of section 852(a) of the Family Code sufficient to transmute the Property to community property if it somehow wasn't already community property.  The Cecconis (and the estate planning attorney who drafted the agreement) could not have been more clear that no matter how they held title to the Pebble Beach Property before April 13, 1998, as of that date, the Property is "the community property of the parties."  *Id*.  Exhs. BC, BD.  If the Pebble Beach Property was in fact already community property, as Trustee contends, and as the Residential Trust states, there was and is no need to find a transmutation.  If, on the other hand, the Pebble Beach Property was separate property of Mrs. Cecconi, whether expressly stated as such in the Residential Trust or not, the "express declaration" in the Residential Trust and the corresponding change of ownership evidenced by the grant deed were sufficient under *MacDonald* to transmute the Property from separate property to community property.

The Supreme Court in *MacDonald* did not require any particular language or characterization of the property, such as separate, community or joint tenancy (*id*. at 273), but it held that the express declaration requirement is not satisfied unless the writing "contains language which expressly states that the characterization or *ownership* of the property *is being changed*."  *Id*. at 272 (emphasis added).   The Supreme Court also held that extrinsic evidence is not admissible to explain or interpret the language used in the writing.

The Bankruptcy Court's conclusion that "there is no such express declaration in the Cecconi Residential Trust" (MD at 78) is not supported, let alone compelled, by *McDonald* or any of the other cases on which it relied. The question in *McDonald* was whether the deceased wife had waived or transmuted her community property interest in three IRA accounts held solely in the name of her husband by merely consenting to her husband's designation of a beneficiary other than herself. The California Supreme Court held that the "consent" signed by the deceased wife was insufficient to transmute her community property interest to the husband's separate property because it failed to contain any "language which expressly states that the characterization or ownership of the property is being changed." *Id.* at 272.

The *MacDonald* court opined that the wife's consent to the husband's designation of their children as beneficiaries of his retirement account would have effected a valid transmutation had they included the phrase, "I give to the account holder any interest I have in the funds deposited in this account." *Id.* at 273. Based on the latter statement, the court in *Estate of Bibb*, 87 Cal. App. 4th 461, 468-69 (2001), held that the word "grant," is the "historically operative word for transferring interests in real property," and was equally effective to satisfy the express declaration requirement. In contrast, no transmutation was found in *In re Marriage of Starkman,* 129 Cal. App. 4th 659 (2005), also cited by the Bankruptcy Court, because the agreement did not identify any specific property as community property, and the Court found the language of the trust agreement ambiguous—in part because it had varying provisions that distinguished between community and separate property held in the trust.

The Cecconi Residential Trust nowhere refers to any separate property of either spouse or settlor other than to declare that "any property held by them in joint tenancy prior to its transfer to the Trust is in fact community property." Exh. BD at 1-2. Even if the Pebble Beach Property was Sarah Cecconi's separate property prior to the Residential Trust, it became community property upon execution of the agreement and grant deed.[10]

---

[10]    *In re Marriage of Barneson*, 69 Cal. App. 4th 583 (1999), also cited by the Court, is not relevant. In *Barneson,* a husband asked his broker to transfer stock certificates into his wife's name after the husband suffered a stroke. In their subsequent divorce proceedings in which the husband sought to establish that the stock was his sole property, the court found that the use of the word "transfer" made the husband's instructions ambiguous, and insufficient to transmute it.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

**IV.    MRS. CECCONI'S PURCHASE MONEY WAS REIMBURSED BY A JOINT OBLIGATION LOAN SECURED BY COMMUNITY PROPERTY, THEREBY EXTINGUISHING ANY RESULTING TRUST.**

Sarah Cecconi was reimbursed for her purchase money paid for the acquisition of the Pebble Beach Property, and her separate property collateral was released and returned to her in 1990 when she and Enzo obtained a joint bank loan secured by a mortgage conveying the Property to the lending bank.   Exh. AQ; MD at 67-69.[11]   The Bankruptcy Court found that "[w]hile the joint mortgage did reimburse Sarah for those funds, Sarah merely exchanged her separate funds for a mortgage which Sarah repaid from her own funds." *Id.* at 69.

Because Enzo assumed a legally enforceable joint financial obligation as a co-borrower, any resulting trust that allegedly arose in 1985 was extinguished by the repayment of Sarah's purchase money and substitution of her separate property collateral by a joint obligation secured by their community property.   This conclusion is supported by the California Supreme Court's decision in *Gudelj v. Gudelj*, 41 Cal. 2d 202 (1953), resolving a dispute over how much separate property had been used to acquire the property at issue.   The Court held that if an obligation is secured by separate property, it will be treated as separate property, and if it is secured by community property, it will be treated as community property.   The court explained the guiding principle as follows:

> [F]unds procured by the hypothecation of separate property of a spouse are separate property of that spouse . . . .  The proceeds of a loan made on the credit of separate property are governed by the same rule . . . .  In accordance with this general principle, the character of property acquired by a sale upon credit is determined according to the intent of the seller to rely upon the separate property of the purchaser or upon a *community asset*.

*Id.* at 210 (emphasis added).   Here the creditor was the Florida Bank—a lender rather than a seller—but the same principle applies.   By their execution of the mortgage, Sarah and Enzo

---

Unlike the husband in *Barneson*, the Cecconis explicitly declared the Pebble Beach Property to be "community property," and conveyed it to the Trust by a grant deed.

[11]    The Bankruptcy Court also refers to stocks of Sarah that were put up as collateral in addition to the mortgage.   The Security Agreement to which the Court refers is Exh. 27.   The value of those stocks or the reason they were required was not in evidence.   Exh. 30 explains that there was a restraint on alienation contained in the earlier deed, which concerned the Bank and resulted at least in part for the request for additional security.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

(defined together as the "Borrower") "does hereby mortgage, grant and convey to Lender" the Pebble Beach Property.  Exh. AQ.  In addition, since the Property was conveyed to the Florida Bank by the terms of the mortgage at Sarah's direction, it extinguished any resulting trust for the reasons previously stated in Section II.B. above.  The fact that Sarah ultimately decided to pay off the mortgage for her own reasons in 1998 (TT 716:6-719:6) is irrelevant because the resulting trust she claims based on her separate property purchase money was extinguished by the reimbursement of her separate funds and the mortgage and joint obligation for payment, which was secured by a community property asset.  Exh. AQ.  While Sarah may have a right to be reimbursed by Enzo for his share of the payments she made with her separate property, any resulting trust was extinguished.

## V.    THE BANKRUPTCY COURT'S DECISION DENYING TERMINATING AND ADVERSE INFERENCE SANCTIONS IS BASED ON ERRONEOUS FINDINGS OF FACT AND CONCLUSIONS OF LAW.

### A.    The Bankruptcy Court's Decision Not To Award Trustee Terminating Sanctions Or Adverse Inference Sanctions Was Based On Clearly Erroneous Factual Findings.

Trustee moved the Bankruptcy Court for terminating sanctions or adverse inference sanctions against Sarah Cecconi on two grounds:  (1) her and her counsels' failure to conduct an appropriate search for, and failure to produce, documents responsive to Trustee's requests for production, and (2) her alteration of relevant documents by applying liquid white-out to parts of the original records, obliterating part of the text.

The Bankruptcy Court made two principal factual findings relating to the sanctions issue. First, the Court found that Sarah Cecconi did not willfully deceive the Court regarding relevant documents in her possession or control or engage "in conduct utterly inconsistent with the orderly administration of justice."  MD at 38.  Second, the Court found that the alteration of documents by liquid white-out by Sarah did not prevent either Trustee or the Court from ascertaining what those documents said.  Both findings are clearly erroneous.

#### 1.    It is undisputed that Sarah Cecconi failed to search for responsive documents and deliberately produced only documents helpful to her own case.

In addressing Sarah's failure to search for relevant documents, the Bankruptcy Court

Shartsis  Friese  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

misperceived or misstated the basis for Trustee's motion.  In its Decision, the Court stated:  "Here the Court finds that Sarah did not willfully deceive the Court regarding relevant documents in her possession or control.  Sarah testified that she and Ms. Korb reviewed the documents sent from Mr. Coleman's office to Sarah."  MD at 37.  However, Sarah testified that she did not review all of those documents.  TT 1742:22-24 and 1844:16-25.  The critical point was not *whether* either Sarah or Ms. Korb had reviewed the boxes of documents sent from Mr. Coleman's office in Florida; rather, the critical point was that their review was exceptionally limited.

The review of documents conducted on behalf of Sarah was commenced by Ms. Korb months before Trustee served his document requests.    Exh. DG;  TT 1733:25-1734:10;  TT 1918:3-16;  TT 1668:13-1169:3;  TT 1747:10-1748:4;  TT 1913:19-1915:3;  TT 1928:7-15;  TT 867:21-868:2.    The search for relevant documents undertaken by Ms. Korb was for the purpose of finding documents to support Sarah's own claim that she paid for the Property and all improvements.  TT 2259:15-2260:4.  There is no evidence that a search was ever conducted to locate documents responsive to Trustee's document requests.    *See, e.g.*, TT 1742:22-24;  TT 1844:16-25 (testimony from Mrs. Cecconi that she had not reviewed all her files or for correspondence from her father or anyone else regarding title to the Pebble Beach Property).  Even more significantly, Sarah's attorneys never conducted any search for documents located in Pebble Beach and left document production entirely in Sarah's hands.

Sarah was also asked whether she had searched for responsive documents in Venice since that is where she has resided most of every year since 1974.  TT 1701:9-11; TT 1714:12-23.  Sarah avoided giving a straightforward answer, instead stating several times that the house in Venice did not have "enough room" for her to maintain files there.  *See, e.g.*, TT 1698:22-25 and TT 1701:12-18.  Sarah's mother testified, however, that the Venice residence has four bedrooms, TT 2054:21-2055:2, and Sarah admitted that she stores papers there relating to this litigation, TT 1699:1-4.  Her counsel, Ms. Seid, admitted that she did not ask Sarah whether she had any documents or records concerning the Property in Venice.  TT 2262:5-8.

Sarah affirmed that she probably maintained documents in London at one time but gave a vague response that she had discarded them at some point—rather than sending them to Pebble

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

Beach or Venice.  TT 1700:25-1701:11.  Enzo also testified that his London solicitors may have had documents referring or relating to the Property, but he made no inquiry of his solicitors and produced no documents, except a copy of the Residential Trust.  TT 569:23-573:23; Exh. DJ. Nonetheless, either Sarah or Enzo managed to get a clearly responsive document to Gary Vandeweghe, Sarah's personal attorney and long-time friend, so that he could use that document (Exh. DE) in deposing Trustee and a representative from the Royal Bank in this adversary proceeding.  This document was never produced by Sarah or Enzo in response to Trustee's document requests.  TT 1111:25-1113:7; 1798:6-1799:2.

Finally, Ms. Seid, counsel for Sarah, admitted at trial that neither she nor anyone in her office **ever** reviewed Sarah's files to assure that all responsive documents were being produced. TT 2260:16-2261:8; 2263:14-2264:14; 2265:5-11; and 2313:3-7.  In fact, counsel admitted that neither she nor anyone in her office reviewed even the limited set of documents in the boxes sent to Sarah from Mr. Coleman's Florida office.  TT 2260:16-2261:8.  Ms. Seid also admitted that she had no way of knowing whether Sarah had withheld any documents harmful to her own position.  TT 2310:8-11.

Trustee identified multiple categories of documents that Sarah testified at trial existed at one time that should have been produced in response to his document requests.  For instance, Sarah testified that she and her father (and she and Ms. Korb) usually communicated by mail or facsimile, but failed to produce any facsimiles and produced little correspondence relating to the acquisition, financing or development of the Pebble Beach Property despite the fact that Mr. Coleman arranged all financing and Ms. Korb sent the Cecconis various documents for their signatures.  No correspondence between Sarah and her father was produced before trial.  Without explanation, Sarah during trial produced a letter from her father (Exh. 172)—a letter she construed as favorable to her own case and two other letters, one letter from Sarah to her father and one to Ms. Korb.  Exhs. 171 and 170, respectively.  At that time—almost two years before its Decision—the Bankruptcy Court expressed its views regarding the document review and production by Sarah during Ms. Seid's testimony as follows:

Every document that related in any way to this property should have been

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1

produced to you [Ms. Seid], at least, and then you should have looked at it. Any
document that had anything to do with their loans, their finances, anything you
should have gotten. And then you should have made these decisions, not Carla
Korb. And Mrs. Cecconi obviously didn't make any decisions.

2

3

4

TT 1669:17-23. The Court further stated:

5

6

7

8

9

If she [Trustee's counsel] asked for anything relating to the sale of the property,
then you, anytime the word "sale" is in any letter, you have to look at it. That
means—anything relating to the purchase or sale of the property, that means
anything that's talking about the sale, the possible sale, anything. You may decide
ultimately as the lawyer that it is or isn't responsive, *but to have Carla Korb make
that decision and to have you draw it narrowly for her was irresponsible.* You
should have looked at this document and you should have made sure any
document relating to that property and the finances was looked at by you.
[Ms. Seid]

10

TT 1670:7-18 (emphasis added). The Court admitted all three exhibits and other documents into

11

evidence over Trustee's objections, despite the clear prejudice.

12

Many loan documents Sarah selectively submitted as exhibits at trial were missing

13

attachments that likely referred to Enzo. For example, Exhibit 13, a letter from Ms. Korb to Mr.

14

and Mrs. Cecconi, references attached correspondence from the Florida Bank to both of them.

15

However, no letter to Enzo, Sarah or both of them was produced with this document. Exh. 13;

16

TT 1850:2-1851:6. Exhibit 13 is also missing an attachment from the Florida Bank—the U-1

17

form, which required borrower to state the purpose of the loan. U-1 forms were also missing

18

from other loan documents Sarah submitted as exhibits. *See, e.g.*, Exhs. 16 and 19; TT 1651:7-

19

1652:13.

20

Notwithstanding this evidence and its earlier recognition of these discovery failures, the

21

Bankruptcy Court concluded two years later when it issued its Decision: "The Court also finds

22

that Sarah has not engaged in conduct utterly inconsistent with the orderly administration of

23

justice. . . . There is no evidence that Sarah systematically reviewed documents in her possession

24

and decided not to produce them." MD at 37-38. This conclusion would establish a remarkably

25

low standard for the "orderly administration of justice." Sarah admitted that she did not review

26

all of the boxes of documents in her possession and never saw the Trustee's discovery requests.

27

Trustee's point was that Sarah had entirely failed to conduct a reasonable search and failed to

28

produce even those responsive documents she did locate. She produced no correspondence or

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

facsimiles exchanged with her father and few exchanged with Ms. Korb regarding the Property even though she testified that they communicated regularly, and the only correspondence she disclosed was correspondence that she considered favorable to her claim.  Most critically, neither she nor her counsel could certify that all responsive documents had been produced.

### 2. Sarah Cecconi irrevocably obliterated important information from original documents by deliberately applying liquid white-out.

Despite the fact that Sarah admitted deleting evidence through hundreds of white-outs on numerous original documents (Exh. DW), the Bankruptcy Court determined that neither terminating sanctions nor adverse inferences were warranted.   This conclusion rested substantially on the factual finding that Trustee and the Bankruptcy Court could determine what text had originally appeared on the altered documents.  *See* MD at 42.  In other words, because the Trustee discovered that Sarah had altered evidence, she was absolved of any significant consequences.  Of course, if Sarah had not been caught, she would have succeeded in her tampering with evidence and similarly avoided any negative consequences.

In fact, contrary to the Bankruptcy Court's findings, a number of documents admitted into evidence contained sections where white-out had been applied so thoroughly that the original text could not be determined.  *See, e.g.*, Exhs.88;  102 at 63 and 64; 103 at 59-61; 104 at 38, 49 and 50; 106 at 67, 69 and 95; 108 at 90 ff.; and 109 at 92 and 103.  Sarah testified that she could not recall why or what text she had whited-out on the memorandum line of various checks.  TT 2084:21-2085:3.   As her counsel, Ms. Seid, admitted, the memorandum lines might have included Mr. Cecconi's name or other information relevant to this case.  TT 2293:3-6.  Another letter produced by Sarah during trial contained large white spaces in the text.   Exh. 42 at 6; TT 716:6-719:6.  It was impossible to determine whether or how the document had been altered because Sarah could not or did not produce the original.  The fair inference in all these instances was that the missing material contained information adverse to Sarah's claims.

The reason Sarah's lawyers initially gave for her obliteration of her husband's name on certain insurance statements was that "the insurance is for her home and she pays the insurance premium."  Exh. DP; TT 1930:6-24.  In contrast, the explanation she gave on direct examination

1    at trial was that she became angry at her husband and at the Royal Bank for "coming after" her.

2    Of course, being upset at an adversary is not a recognized basis for tampering with evidence and

3    is all the more reason Sarah should not have been the person responsible for determining which

4    documents would be produced.  Sarah's attempt to minimize the significance of redacting her

5    husband's name from forty-four insurance statements should not have been supported.  She

6    confirmed at trial that her lawyers' original statement of her reasons was accurate.  TT 1930:6-24.

7    She acted based on her view that the house was not community property—the very issue disputed

8    by her in this case.

9       **B.    Terminating Or Adverse Inference Sanctions Were Supported By The Facts**
10          **And Applicable Law, And The Bankruptcy Court's Contrary Findings And**
            **Conclusions Are Clearly Erroneous Or An Abuse of Discretion.**

11       The Bankruptcy Court has the inherent power to sanction party misconduct.  *Caldwell v.*

12   *Unified Capital Corp. (In re Rainbow Magazine)*, 77 F.3d 278, 284-85 (9th Cir. 1996), *citing,*

13   *inter alia, Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  Alteration of documents by intentional

14   obliteration of text constitutes spoliation of evidence.  Spoliation is defined as "the destruction or

15   significant alteration of evidence, or the failure to preserve property for another's use as evidence

16   in pending or reasonably foreseeable litigation."  *Byrnie v. Town of Cromwell Bd. of Educ.*, 243

17   F.3d 93, 107 (2nd Cir. 2001) (discussing the destruction of employment evaluations).  *See also*

18   Black's Law Dictionary (8th Ed. 2004) (defining spoliation as the "intentional destruction,

19   mutilation, alteration or concealment of evidence").

20       Spoliation of evidence is a recognized ground for terminating sanctions.  *Combs v.*

21   *Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir. 1991) ("Falsifying evidence is grounds for the

22   imposition of the sanction of dismissal.") (referring to alteration of deposition testimony in thirty-

23   six instances).  Notably, a party's discovery misconduct need not be in bad faith to justify

24   terminating sanctions; dismissal is proper where the conduct to be sanctioned was due to

25   willfulness, fault **or** bad faith.  *National Hockey League v. Metropolitan Hockey Club*, 427 U.S.

26   639, 640 (1976); *Wyle v. R. J. Reynolds*, 709 F.2d 585, 591 (9th Cir. 1983) (upholding dismissal

27   sanction where plaintiff falsely denied material facts and frustrated document discovery).  Due

28   process also requires that the sanctioned misconduct relate to the substance of the matter in

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1    controversy, such that the abuse threatens to interfere with the rightful decision in the case. *Wyle*,

2    709 F.2d at 589, 590; *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348

3    (9th Cir. 1995).

4         When Sarah's spoliation of evidence came to light, Trustee specifically requested in

5    writing that Sarah and her counsel provide certification that no other responsive documents

6    existed that had not been produced and that no other documents had been altered.    This

7    certification was never made—and could not be made—since Sarah's counsel failed to conduct

8    any search for documents or review the universe of potentially relevant documents. Exh. DQ; TT

9    2310:8-11; 2312:14-2313:7.    Trustee was deprived of his right to a fair trial by the failure of

10    Sarah and her counsel to review and produce all requested documents and by Sarah's intentional

11    spoliation of evidence.    Because the integrity of the fact-finding process was irrevocably

12    compromised, terminating sanctions were justified.

13         A finding of bad faith is not required before an adverse inference may be applied.  Instead,

14    the standard for application of an adverse inference requires merely notice that the altered

15    material might be relevant to the litigation.  "Where breach of a discovery obligation consists of

16    the spoliation or destruction of relevant evidence, courts have broad discretion in fashioning an

17    appropriate sanction, including . . . application of an adverse inference." *Glover v. BIC Corp.*, 6

18    F.3d 1318, 1329 (9th Cir. 1993).  As to bad faith:  ". . . [A] finding of "bad faith" is not a

19    prerequisite to this corrective procedure.  Surely a finding of bad faith will suffice, but so will

20    simple notice of potential relevance to the litigation." *Id.* (disapproving jury instruction implying

21    that party seeking sanctions had to prove bad faith).

22         The standard for drawing an adverse inference clearly was met here.  Mrs. Cecconi had an

23    obligation to preserve evidence when she whited-out her husband's name and other now

24    unidentifiable information; she admitting making the white-outs deliberately and knowingly.

25    While she claimed she had no intent to deceive the Court, there could be no other reason.  The

26    obliterated evidence—Mr. Cecconi's name listed as a "homeowner" on insurance statements and

27    other records—was clearly relevant to the question of ownership of the Pebble Beach Property

28    that was before the Court.  Given that there was no way to tell what was concealed by certain

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1  white-outs on documents other than the homeowners' insurance statements, and made marks and

2  comments on numerous other documents, the only fair inference to have drawn was that those

3  documents contained information adverse to Sarah.

4          At a minimum, the Bankruptcy Court should have drawn all inferences against Sarah and

5  in favor of Trustee.  It did just the opposite, totally disregarding the rights of Trustee and making

6  a mockery of pre-trial discovery.  Its Decision is clear error based on the undisputed facts.

7                                      **CONCLUSION**

8          The question Mrs. Cecconi did not, and cannot, answer is why she acquired the Pebble

9  Beach Property more than 20 years ago as community property if she intended it to be her

10  separate property.   She cannot answer that question because she always intended it to be

11  community property and did all of her estate planning based on their community property

12  ownership.  The only reason she now claims that it is her separate property is because, in her own

13  words, "The Royal Bank of Scotland came after me" in 2001 and the Trustee of Enzo's

14  bankruptcy estate commenced this proceeding for the benefit of her husband's creditors in 2002.

15  Her acts and conduct over the past 20 years are inconsistent with separate property ownership for

16  all of the reasons discussed above.  Her wrongful pretrial conduct also deprived the Trustee of a

17  fair trial.  This court should reverse the judgment of the Bankruptcy Court and enter judgment for

18  Trustee.

19  DATED:  September 4, 2007                SHARTSIS FRIESE LLP

20

21                                          By:    /s/ Mary Jo Shartsis
                                                 MARY JO SHARTSIS
22                                          Attorneys for Appellant
                                            A.C. SPICER, TRUSTEE IN BANKRUPTCY
23  6043\002\MSHARTSIS\1449741.2

24

25

26

27

28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111